# Illinois Official Reports

## Appellate Court

---

### *People v. Althoff*, 2020 IL App (2d) 180993

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES E. ALTHOFF, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-18-0993 |
| Filed | January 8, 2020 |
| Decision Under Review | Appeal from the Circuit Court of De Kalb County, No. 16-DT-408; the Hon. Philip G. Montgomery, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Phyllis J. Perko, of Law Offices of Harlovic & Perko, of West Dundee, for appellant.<br><br>Richard D. Amato, State's Attorney, of Sycamore (Patrick Delfino and Edward R. Psenicka, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant, James E. Althoff, was found guilty of, among other things, driving while under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2016)). On appeal, he argues that the trial court should have afforded him some relief for the State's failure to produce a squad-car-camera video of the stop and the complete booking-room video. Because we determine that the State did not commit a discovery violation, we conclude that the trial court did not err in denying defendant any relief. Accordingly, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    After defendant was arrested for DUI, he asked the State to produce videos of his stop and what transpired in the booking room thereafter. Although the State eventually produced a video of some of what transpired in the booking room, it did not produce any video of the stop. Thus, defendant moved the court to dismiss the case or bar the State from eliciting testimony about events that would have been on the missing videos.

¶ 4    At a subsequent hearing, before the court heard any evidence, defendant advised the court that "again, although [he] may change [his] opinion today, depending on what's said or not said, at this point [he was] not alleging malfeasance and intent ***. That's not the key."

¶ 5    The evidence revealed that, in late October 2016, the arresting officer, Greyson Scott, had one year of experience with another police department and had just finished his one year of probation with the Sycamore Police Department. During his probationary term, two field-training officers trained Scott on how to use the squad-car camera.

¶ 6    When Scott reported to work on October 30, 2016, he completed an inspection report for his squad car before taking it out on patrol. The inspection included checking the emergency lights, camera, and microphone. An inspection of the camera and microphone involved "looking at [the] microphone and looking at the camera to make sure it's blinking." Scott did not notice that anything in the squad car was malfunctioning.

¶ 7    At 11:30 p.m., Scott saw defendant turn without signaling and make an improper U-turn. Scott activated his emergency lights and stopped defendant. Scott believed that, as soon as the emergency lights were activated, the squad-car camera began recording the stop. Again, nothing indicated that the squad-car camera was not functioning properly.

¶ 8    Once defendant exhibited indicia of intoxication, Scott repositioned his squad car to record defendant's performance on various field sobriety tests. After moving the squad car, Scott verified that the squad-car camera and microphone were "activated." This entailed observing that the lights on the camera and the microphone were blinking, which meant that they were synched. Nothing indicated that either the camera or the microphone was malfunctioning.

¶ 9    After administering the field sobriety tests, Scott arrested defendant for DUI and transported him to the police department. As soon as Scott pulled into the sally port at the police station, the camera and microphone turned off and Scott placed the microphone in its cradle to charge. At this point, recordings of stops start automatically synching with the main system, which is called VuVault.

¶ 10    Scott then took defendant to the booking room and started his police report for defendant's arrest. Scott, who did not know anything about the booking-room recording system, did nothing to activate that system. As he was preparing his report, Scott checked VuVault to

confirm that the recording of the stop went through. He learned that it did not. He then completed as much of his police report as he could and checked VuVault again before he left the station. The recording of the stop was still not uploaded to VuVault. Scott then, per departmental policy, sent an e-mail to Detective Joseph Meeks, telling him that he could not determine why the recording did not upload. Scott then asked Meeks to pull the SIM card from the squad-car camera and download the video, as Scott did not have access to the SIM card.

¶ 11　　When Scott returned to work on November 2, 2016, he saw that Meeks had sent him an e-mail informing him and the other patrol officers that the squad recordings had been "dumped" into VuVault. The recording of defendant's stop was still not there. Per departmental policy, Scott told Commander Cook about the problem. Cook investigated, and he, too, did not find any recording of defendant's stop.

¶ 12　　Sergeant Jeff Wig was the shift sergeant on duty when defendant was arrested. He indicated that the booking-room recording system is always on. Because it is, he has no access to it to turn it on or off. Moreover, nothing in the room indicates whether the system is recording.

¶ 13　　Wig was called into the booking room to administer defendant's breath test. Wig had no reason to believe that the recording system was not working at that time.

¶ 14　　Sergeant Rod Swartzendruber was the support-services sergeant. Part of his job was to make videos of stops and arrests. He stated that the equipment recording what transpires in the booking room is always on and that no one can stop the automatic upload of a booking-room recording. He did not know if anyone has access to turn the recording equipment off or if the system could be manually shut down. Once recordings are made of what transpires in the booking room, the recordings are transferred to the servers in the locked IT room. Only he and other high-ranking officers have a key to the IT room.

¶ 15　　Swartzendruber made a video of defendant in the booking room. When he downloaded the recording, he noticed that it was approximately one hour shorter than it should have been. Swartzendruber had no idea what transpired in the booking room during that one hour, and he had no explanation for why the error occurred.

¶ 16　　Meeks, who received training in uploading squad-car recordings, retrieved the SIM card from Scott's squad car. Although anyone could access the SIM card, only Meeks and Cook had the authority to pull the card. When Meeks retrieved the card, he did not notice anything unusual, including any tampering with the squad car.

¶ 17　　Meeks inserted the SIM card into his computer and manually uploaded the files to VuVault. He searched for the recording of defendant's stop and could not locate it. Meeks then saw that there were no recordings on the card since October 18, 2016. Meeks formatted and activated the card, put it back in the squad-car camera, and tested it to ensure that it was working properly.

¶ 18　　When asked how the recordings are uploaded to VuVault, Meeks explained that,

> "when the squad comes in, there is an automatic process by which the car hooks up to the server via a wireless antenna, and then the download process begins. In that process, the files get uploaded from the car to the server automatically. Once the server has all the files ***, it's then processed and available via VuVault."

After the recording is transferred from the squad-car camera, the recording is removed from the camera. Although Meeks agreed that other recordings had not been properly transferred from squad-car cameras to VuVault, such occurrences were rare.

¶ 19    Defendant moved for a directed finding. In doing so, he reiterated that "it is not an issue of intentional or—if I may, intentional [*sic*] or malfeasance." The court denied the motion for a directed finding.

¶ 20    The court subsequently denied defendant's motion to dismiss the case or bar testimony, noting that there was no evidence that a recording of the stop or the missing portion of the booking-room video ever actually existed.

¶ 21    A jury subsequently found defendant guilty of, among other things, DUI, and defendant moved the court to reconsider, again challenging the court's admission of testimony related to what transpired when defendant was stopped and booked. The court denied the motion and sentenced defendant to 18 months of conditional discharge. This timely appeal followed.

¶ 22                                          II. ANALYSIS

¶ 23    At issue in this appeal is whether defendant should have been afforded any relief for the State's failure to produce videos of the stop and the entirety of what transpired in the booking room. In resolving that issue, we must first consider whether the State's failure constituted a discovery violation. *People v. Kladis*, 2011 IL 110920, ¶ 24. We review that issue *de novo*. *People v. Tsiamas*, 2015 IL App (2d) 140859, ¶ 9.

¶ 24    Defendant was charged with a Class A misdemeanor. 625 ILCS 5/11-501(c)(1) (West 2016) (DUI under subsection (a)(2) is a Class A misdemeanor (see *id.* § 11-501(a)(2))). There is no question that the recordings of the stop and what transpired in the booking room were discoverable in this misdemeanor case. See *People v. Moises*, 2015 IL App (3d) 140577, ¶ 11; see also *Tsiamas*, 2015 IL App (2d) 140859, ¶ 12. However, the mere fact that the evidence was discoverable does not mean that the State's failure to produce it amounted to a discovery violation.

¶ 25    A discovery violation can arise as either a due process violation or a violation under Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 1, 1971). *People v. Borys*, 2013 IL App (1st) 111629, ¶ 17. The United States Supreme Court has made clear that, when evidence is potentially useful but not "material exculpatory evidence," a due process violation arises only if the defendant can show that the State acted in bad faith. *Id.*; see also *Illinois v. Fisher*, 540 U.S. 544, 545, 548-49 (2004) (failure to preserve white powdery substance so that the defendant charged with unlawful possession of cocaine could test it was not a due process violation, because, among other things, such testing would be only potentially useful and not material exculpatory evidence). Nothing in the record indicates that what would have been depicted on the recordings was anything other than potentially useful evidence, and at the hearing, defendant made clear that he was not claiming that the State acted in bad faith. Accordingly, he cannot establish a due process violation.

¶ 26    Bad faith or the material exculpatory value of the evidence is not required for a discovery violation under Rule 415(g)(i). *Borys*, 2013 IL App (1st) 111629, ¶ 17. Rather, to establish a discovery violation pursuant to that rule, a defendant needs to show only that the State failed to comply with an applicable discovery rule or an order issued pursuant to it. *Id.* However, the State does not commit a discovery violation by failing to produce evidence that never existed. Three cases are instructive on that point.

¶ 27    First, in *People v. Aronson*, 408 Ill. App. 3d 946, 948 (2011), the defendant asked for any video related to her traffic case. The State could not give the defendant any such video because

the recording that was made was " 'not viewable.' " *Id.* Although the trial court did not sanction the State for its inability to turn over viewable video, it granted the defendant's petition to rescind the statutory summary suspension of her driving privileges, noting numerous times that it was troubled by the fact that there was a " 'tape' " of the defendant's stop and arrest. *Id.* at 950. In affirming, we noted that, although the arresting officer's squad-car camera recorded the stop, a technical problem prevented the State from producing a viewable recording. *Id.* at 952. "[T]he fact that a video could not be produced does not mean that a recording was not made." *Id.*

¶ 28    Second, in *People v. Strobel*, 2014 IL App (1st) 130300, ¶¶ 1, 4, the State produced a video of the defendant's stop, but that video did not contain any audio, as the arresting officer failed to turn on that recording equipment. The trial court found that this was a discovery violation, but the appellate court reversed. *Id.* ¶¶ 5, 12. The appellate court noted that, because no audio recording ever existed, this was not a case where the State failed to turn over evidence in its possession that the defendant had requested. *Id.* ¶ 11.

¶ 29    Last, in *Moises*, the State gave the defendant a video without his performance on the field sobriety tests because the arresting officer had directed the defendant to perform the tests in an area off-camera. *Moises*, 2015 IL App (3d) 140577, ¶ 4. The trial court found that this was a discovery violation, but the appellate court disagreed because "the evidence desired by [the] defendant never existed in the first place." *Id.* ¶ 15.

¶ 30    Here, as in *Strobel* and *Moises*, nothing in the record indicates that a *recording* of the stop or the entirety of what transpired in the booking room ever existed. Scott believed that the squad-car camera and microphone were working simply because the camera was blinking. That, without other evidence, does not establish that the camera was functioning properly. Moreover, no recording of the stop was ever uploaded to VuVault, and when Meeks attempted to manually download a recording from the SIM card, he could not find a recording. Meeks's examination of the files on that card revealed that no recording had been made since October 18, 2016, 12 days prior to defendant's stop and arrest. Because no recording ever existed, this case is unlike *Aronson*, where a recording was made but the downloaded tape of that recording was not viewable.

¶ 31    Likewise, no evidence indicates that a full recording of what transpired in the booking room ever existed.[1] The evidence indicates that the recording system in the booking room is always on and that not even high-ranking officers can stop the automatic upload of a recording. Once what transpires in the booking room is recorded, the recordings are automatically transferred to the servers in the locked IT room. Swartzendruber, who, as part of his job responsibilities, made a video of what transpired in the booking room, had no explanation for why the recording was incomplete.

_____

[1] As the State notes, the missing portion of the video most likely would have shown Wig administering a Breathalyzer test. At defendant's trial, the court struck Wig's testimony, as the State failed to prove that the Breathalyzer machine was properly certified. The court also granted defendant's motion for a directed finding on a *per se* DUI charge (625 ILCS 5/11-501(a)(1) (West 2016)), as Wig's testimony provided the evidence that defendant was driving while his blood-alcohol concentration was over the legal limit. Thus, like the State, we believe that the missing portion of the video would have been of limited value to defendant's case. Nevertheless, we address defendant's argument concerning that recording.

¶ 32    Defendant argues that this case is distinguishable from *Strobel*, where no audio recording ever existed, because the officer never turned on the audio-recording equipment. But in our view, this case presents an even stronger basis for finding no discovery violation. Unlike in *Strobel*, nothing indicates that the police here affirmatively, whether intentionally or inadvertently, did anything to prevent the recording of the stop or the entirety of what transpired in the booking room. Thus, if *Strobel* warranted finding that no discovery violation occurred, this case most certainly does.[2]

¶ 33    Defendant also argues that the evidence indicates that recordings were made. We disagree. Absent evidence indicating that the State could have at one time produced a recording of the stop or the entirety of what transpired in the booking room, regardless of whether the recordings would be viewable, we cannot conclude that the State committed a discovery violation. Given that the manifest weight of the evidence does not prove that recordings were ever made, no discovery violation occurred. *Id.* ¶ 4.

¶ 34    We determine that the trial court's finding, that a recording of the stop and the missing portion of the booking-room video was not proven to have existed, is not against the manifest weight of the evidence. Thus, the State could not provide that which does not exist and could not have committed a discovery violation. Because the State did not commit a discovery violation, defendant was not entitled to any relief.

¶ 35                                    III. CONCLUSION

¶ 36    For these reasons, the judgment of the circuit court of De Kalb County is affirmed.

¶ 37    Affirmed.

---

[2]With this statement, we are in no way implying that discovery sanctions should be imposed to punish a party who fails to comply with discovery. See *Strobel*, 2014 IL App (1st) 130300, ¶ 9.