2022 IL App (2d) 191121-U
No. 2-19-1121
Order filed March 17, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-326 |
| RICHARD CLEVELAND, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial court did not err in denying motions *in limine* or jury instruction on lesser included offense on aggravated battery count, but should have instructed jury on lesser included offense on aggravated domestic battery counts.

¶ 2    On June 20, 2019, a jury found the defendant, Richard Cleveland, guilty of 11 counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.30(a)(2) (West 2014)), two counts of aggravated domestic battery (*id.* § 12-3.3(a)), and one count of aggravated battery (*id.* § 12-3.05(a)(1)).  His sentence totaled 85 years.  He appeals, arguing that the trial court erred in denying two motions *in limine*, refusing to instruct the jury on lesser included offenses, and failing

to merge his convictions on counts 4 and 6 under the one-act, one-crime doctrine. We vacate his convictions on two counts and affirm the remainder of his convictions.

¶ 3                                     I. BACKGROUND

¶ 4     The charges against Cleveland arose from five incidents involving his then-wife, C.: two separate occasions when electrodes were placed in C.'s vagina and anus and electricity was sent through her body; Cleveland's punching of C.'s breast during sex; the insertion of wooden baseball bats into C.'s anus; and Cleveland's striking of C.'s buttocks with his belt. All of the incidents took place between June 1 and September 14 of 2016.

¶ 5     Cleveland's defense was consent. He asserted that, throughout their marriage, he and C. voluntarily engaged in sadomasochistic and rough sex, and the charged acts were a continuation of sexual practices that C. consented to. This defense required the court to carefully balance Cleveland's right to defend himself with the rape shield law, section 115-7 of the Code of Criminal Procedure of 1963 (Code), which bars certain evidence in prosecutions for, among other things, aggravated criminal sexual assault:

> "[T]he prior sexual activity or the reputation of the alleged victim *** is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim *** with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim *** consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2014).

When a party seeks to introduce or bar such evidence, the trial court must hold a hearing, and "shall not admit evidence under this Section unless it determines at the hearing that the evidence

is relevant and the probative value of the evidence outweighs the danger of unfair prejudice." *Id.* § 115-7(b).

¶ 6 Prior to trial, the State sought to redact portions of Cleveland's videotaped statement to the police and to bar other evidence to prevent references to sexual activity between C. and persons other than Cleveland. At the same time, Cleveland sought to remove from his statement references to uncharged prior bad acts. The trial court granted both requests, and the State produced a redacted version of Cleveland's videotaped statement.

¶ 7 After reviewing the redacted video, Cleveland filed his seventh and eighth motions *in limine*. The seventh motion argued that the redacted video still contained certain irrelevant and prejudicial statements that should be excluded, specifically, various statements made by the police interviewers that reflected strong negative emotions about Cleveland's actions with C. The eighth motion argued that certain of Cleveland's statements had been unfairly removed from the video and should be reinstated under the completeness doctrine. The trial court denied both motions.

¶ 8 The case was tried to a jury over three days in June 2019. The great majority of the evidence consisted of C.'s testimony, Cleveland's videotaped statement (redacted as noted above), and a video taken by Cleveland showing one of the incidents involving the placement of electrodes on and into C.'s body.

¶ 9 C. testified that she and Cleveland married in 2005 and had one daughter together. They were divorced by the time of trial. For the most part, their married relationship was good. Beginning in June 2016, however, the relationship became "erratic" and "volatile." Cleveland had begun drinking to excess, and "[o]ne minute it could be a loving home" and "[t]he next moment you would be in fear for your life." C. worked outside the home and took their daughter to taekwondo classes at a studio where C. also took classes. Cleveland began calling C. repeatedly

when she was not at home. C. began to feel afraid of Cleveland, who was much taller and heavier than her and was muscular. Cleveland also kept a number of guns, both in a gun room in the basement and in various locations around the house, including the pantry, the console of the loveseat in their front room, and their bedroom closet. C. identified some of the many handguns, shotguns, rifles, and assault rifles that Cleveland kept in the house, including a "500" that Cleveland boasted could bring down an elephant, a sawed-off shotgun, and several handguns. C. owned a handgun herself but did not carry it and had never shot it.

¶ 10    Cleveland normally carried a gun in his back pocket. On one occasion, Cleveland pointed a gun at her and told her that he would take her to a remote location, torture her slowly over two days, and kill her. Their daughter and Cleveland's mother, who was ill and lived with them, were elsewhere in the house at the time. Although C. initially testified that the incident happened in June 2016, on cross-examination she said that she could not remember exactly when it happened, and it could have been in September 2016.

¶ 11    C.'s mother lived in Door County, Wisconsin, and C. and her daughter visited her whenever C. could get some time off to make it a four-day weekend. When C. and her daughter visited in July 2016, Cleveland called her constantly, drunk, and screamed incoherently at her. On the day C. was leaving to come home, Cleveland called and asked her to write a note before she came home, telling her that she could not come home without it. He told her that it should say that she was willing to do anything to fix the marriage, and that he would be the master. C. agreed and began driving home. When she stopped to eat, she took a piece of paper from her daughter's notebook and wrote the note he had demanded.

¶ 12    The note read, "In order to fix and save the marriage, I, [C.], agree to be Rich Cleveland's submissive. Rich will be referred to as master, sir. If Rich so chooses, he will wake me in the

middle of the night, and I am to do as ordered. Rich will make sure of my well-being and safety. I trust him to do so. This is to prove the love I have for him and him alone. I will do what my master says." She signed her name. Below her signature was the following: "I understand that pain will be involved. I won't call out. I will never look at my husband with disrespect or that I don't love him."

¶ 13    C. testified that she wrote the portion of the note above her signature during the meal break on the way home. After she arrived home and gave the note to Cleveland, he became angry that she had inserted the words that he would safeguard her well-being and safety and that she trusted him, because he had not told her to write that. He backhanded her across the face, saying that the note was not how it was supposed to be and ordering her to rewrite it. C. refused, and Cleveland hit her in the face again and grabbed her by the hair, holding her until she added the words below her signature, which he dictated to her. He then took the note, folded it, and put it in his wallet.

¶ 14    Less than a week later, after their daughter was in bed and Cleveland's mother was in her room, Cleveland ordered C. to go down to the basement, where there was some furniture as well as the gun room and the laundry machines. Telling her that this had to be done to fix the marriage, Cleveland had C. strip to her socks. He tied her hands above her head, put her head into a harness device, and tied her legs open with rachet ropes to two support pillars. C. was hanging from her hands, which were attached to a beam in the basement ceiling. Cleveland placed pads that used electricity to vibrate or pulsate on her breasts and above her vagina. He then took a toy train-type transformer or electrical device that plugged into a wall outlet and had two electrical leads with clips coming from it, and he placed one clip in her vagina and one in her rectum. He turned on the electrical current. C. testified that she screamed, as the pain was "unimaginable." Cleveland then turned the current up farther because she had screamed despite promising not to in the note.

Cleveland counted out a number of seconds, such as fifteen, before turning off the current. He then did this again, repeating it more times than she could count, sometimes moving the electrodes around, for about a half hour. At one point, C. begged him to release her left foot because the ratchet was too tight. C. testified that she still had little feeling on the top of that foot. When it was all over, Cleveland released her and helped her down. At trial, C. identified the electrical device, harness, ropes and ratchet ties that Cleveland used on her, and they were admitted into evidence.

¶ 15    C. testified that, after this incident, she had burns and permanent scarring on her genitals, some of the hair was burnt off, and the area was "incredibly tender." The next day at work, she took a photo with her phone of the area. The photo, which showed areas of blackened skin around her vaginal opening and on her inner thighs, was identified and admitted into evidence at trial. C. could not see her back side, but assumed that she had similar injuries there. She also felt pain on her chest.

¶ 16    Some time between that incident and mid-September, Cleveland told C. that he wanted to insert a baseball bat into her anus and "pummel" her with it. He had her bend over and straddle a bed in the basement. He first tried to insert a full-size baseball bat that had been sanded down somewhat, but it would not fit. He then inserted into her anus a smaller wooden bat that was more than 12 inches long. Cleveland pushed it into her as far as it would go and then moved it in and out for about 15 minutes. C. screamed, but she tried not to, because when she did, Cleveland would push harder.

¶ 17    Asked why she allowed Cleveland to do this and the other charged acts, C. said that she did not want to but felt that she had no choice, because Cleveland was bigger, stronger, and very dominating and intimidating. He always carried a gun or had one within reach. Although C. had

achieved the first level of black belt in her taekwondo class, the class did not teach her how to protect herself from someone with a gun. C. also wanted to protect their daughter.

¶ 18    On August 6, the family attended the wedding of Cleveland's daughter from a previous marriage. Later that evening, as Cleveland and C. were having sex, he began grabbing and twisting each breast and then punched her repeatedly in the breast. She told him that it hurt but he kept going for 20 to 30 minutes. The next day her breasts were black and blue. C. identified a photo she had taken a few days later that showed a large, dark bruise to her left breast.

¶ 19    The second incident involving electric current occurred sometime between mid-July and late August 2016 and took place on a loveseat in the basement. The episode was filmed by Cleveland with his phone, and the video recording was introduced at trial and played for the jury. In the video, Cleveland instructed C. to place one electrical clip from the transformer into her vagina and one into her anus. C. told him that she had forgotten to take Imodium that day and left briefly. When she returned, she did as Cleveland instructed. Cleveland then turned the electrical current on. C. gasped as her muscles began to spasm and cried out, her face contorted in pain. She repeated, "I can't do this! I can't do this!" between sobbing breaths. Cleveland shocked her repeatedly for about two minutes, telling her to stop yelling out. He threatened to leave, saying that she had promised to do this and not to yell, and C. begged him not to, saying that she wanted to do it but could not. Cleveland told her she should "get it over with."

¶ 20    After a delay to get the clips repositioned, including one on C.'s breast, Cleveland turned the electricity on again and kept it on while he counted to 15. C. muffled her cries by stuffing a towel into her mouth. After that 15-count shock, Cleveland immediately began another one. C. began crying, spasming, grimacing, and screaming, alternately begging him to stop and apologizing for crying out. Turning the dial on the electrical device, Cleveland asked her whether

it was worse one way or another way, warned her to be quiet as his mother was upstairs, and told her that he wouldn't stop until she was completely quiet. C. said she had to take the device off, and Cleveland increased the intensity, telling her to shut her f***ing mouth. After more than 10 minutes of shocking her, during which there was the sound of a slap and Cleveland saying, "That's for lying to me," he turned the electrical current off and allowed her to remove the device. C. testified that, throughout the episode, he was holding a gun along with his phone or had a gun in his back pocket. Cleveland later had her download the video to his computer.

¶ 21    C. had an appointment for a gynecological appointment on September 13, 2016. The night before, Cleveland beat one side of her buttocks with a belt, ostensibly as punishment because she had been smoking. After the appointment, he used the belt to beat the other side. Photos of C.'s buttocks taken after his arrest showed extensive linear bruising and red marks, some linear and some in the shape of the belt's buckle and studs. There was bruising across C.'s lower back as well, including a large, very dark bruise.

¶ 22    C. took one picture herself of the bruises on her hips and sent the photo to two friends at work, saying that if anything happened to her, they would know why. Someone went to the human resources office at her employer, which contacted the Shorewood police. C. testified that, because she was terrified of the consequences if she deviated from her ordinary routine, after work she did not go straight to the police station but instead went to taekwondo. Cleveland met her there with their daughter and his mother and then left. C. and their daughter went to the police station, where C. gave a statement, describing her injuries and the guns at the house, and showing them the pictures on her phone. She had never called the police before, worried that it would take the responders too long to reach their rural home. Still too afraid to abandon her usual routine, she returned to the taekwondo studio before the end of her class, collected Cleveland's mother, and

went home. Before she left the police station, the police promised to stay nearby in case they were needed.

¶ 23    Cleveland was not there when she got home. He returned a short time later, setting off the alarm, which he did not turn off. As C. went to turn it off, she saw Cleveland urinating in the kitchen sink and heard him slurring his words, so she knew that he had been drinking. She got into bed with their daughter, but Cleveland followed her and told her to get out of the bed and come with him. Fearing that she was about to be hit, C. came out of the room but kept Cleveland from getting too close to her. Seeing him start to take off his belt to beat her, she called 911. The police arrived and arrested Cleveland.

¶ 24    At the station, Cleveland waived his *Miranda* rights and gave a lengthy videotaped statement. A redacted version of the video was authenticated by an officer and introduced and played at trial. In it, Cleveland confirmed that all of the above incidents occurred, but maintained that C. agreed to them. However, he also admitted that there were times that she wanted him to stop and he did not because he was drunk or angry. Cleveland stated that he knew that C. was afraid of him. He wanted her to forgive him for being drunk and stupid, and for his anger.

¶ 25    Talking about his sexual relationship with C., Cleveland said that they enjoyed it and had "little whips and stuff," and that C. wanted to call him master but he refused. He repeated that they had made an agreement—and C. "even wrote it down"—to "play around with electrical stuff," and it would be "electrical, play toys, whatever you want, whether it's once or twice a week." He agreed that he had left marks on her but said that they had left marks on each other. He said that this was "not the first time" and she had accepted it before, so why was it a problem now? He acknowledged leaving marks with a belt, saying "that shouldn't happen," but insisted that she did not ask him to stop. When asked about the "electrical stuff," he told the police that there was a

video on his computer showing it. Cleveland said that he did not mean to cause burns; they must have occurred when the metal inside the plastic clip came into contact with C.'s bare skin. If he had known that was happening he would have fixed the problem. He would not have used the clips to burn her on purpose because C. could put the clips on him, on his nipples. Regarding the time when he twisted her breasts and punched her, he said that C. had "already twisted [him] up." He maintained that she inserted the bats willingly, but admitted that she probably did not want them inside her and only did it to appease him. He had once pointed a gun at her head. She did not seem scared.

¶ 26    Although they knew each other's thresholds, Cleveland sometimes got carried away and went further. Asked how often, he said probably five or six times since they had known each other, and this was not the first time. He had let himself out of control and he was wrong, and his punishing her was not "within reason," it was with anger. Asked how many times he had "done a little extra to teach her a lesson," he estimated four or maybe six times. C. told him that she was willing to try it if it would solve their problems, but then he wanted more, and look what it led to, with his anger and the alcohol. He agreed that they had started with more "playful sexual things" that involved tying up, electrodes, and some other stuff, but then he started taking it farther than he should. That was 90% out of anger.

¶ 27    A deputy sheriff testified that she interviewed C. and took her to the hospital, staying with C. until she was released. She authenticated photos of C. taken in the hospital, which were admitted into evidence during the State's case. The deputy was later recalled by the defense to impeach C.'s testimony that the bats were used in her anus, testifying that C. had said the bats were inserted into her vagina. The defense also called the detective who interviewed Cleveland, who also interviewed C. when she first came to the police station during taekwondo. C. told him that

she wanted to go home after speaking with him and that, although she was afraid of what Cleveland might do to her, she was not afraid of what he would do to their daughter.

¶ 28    At the jury instruction conference, the defense tendered instructions for battery and aggravated battery, arguing that they were lesser included offenses of aggravated battery and aggravated domestic battery. The trial court refused to give the tendered instructions.

¶ 29    In closing, the defense argued that C. had opportunities to flee or call the police but did not take them, and that she consented to all of the incidents, even if the incidents involved situations that the jury was not used to thinking of as consensual. The defense also argued that C. did not seek medical treatment for any of the incidents and the State had not proven that C. sustained great bodily harm as opposed to bodily harm, as required to convict Cleveland of aggravated battery or aggravated domestic battery. The State reviewed C.'s injuries and argued that C.'s testimony and the video of C.'s electrocution clearly showed that she did not consent to the infliction of those injuries.

¶ 30    The jury convicted Cleveland on all counts. The trial court merged many of the aggravated criminal sexual assault convictions, but rejected the defense argument that counts 4 (aggravated battery involving the infliction of torture via the use of electrodes) and 6 (aggravated domestic battery through placing electrodes on C.'s body) should also be merged. The trial court denied Cleveland's motion for a new trial and sentenced him to a total of 85 years: consecutive sentences of 11 years on each of five counts of aggravated criminal sexual assault arising from the two electric shocking incidents and the punching of C.'s breasts, 21 years for the conviction of aggravated criminal sexual assault involving the use of a deadly weapon (arising from the use of the baseball bats), and 9 years on the aggravated battery charge alleging the infliction of torture;

and concurrent sentences of 5 years on each count of aggravated domestic battery (counts 5 and 6).

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, Cleveland argues that the trial court erred in (1) denying his seventh and eighth motions *in limine*, (2) declining to instruct the jury on battery and domestic battery as lesser included offenses of the aggravated battery and aggravated domestic battery charges, and (3) refusing to merge the convictions on counts 4 and 6. We begin with the motions *in limine*.

¶ 33                            A. Motions *in Limine*

¶ 34                            1. Seventh Motion *in Limine*

¶ 35    On appeal, Cleveland argues that the trial court abused its discretion by allowing evidence of an uncharged act—Cleveland's sticking syringes through C.'s nipples—to remain in the redacted video of his statements to police. The State argues that Cleveland has forfeited this argument. The State is correct.

¶ 36    "It has long been Illinois law that an issue not accompanied by a contemporaneous trial objection and raised in a posttrial motion is forfeited. In the absence of the requisite objections, forfeited issues are reviewable on appeal in a criminal case only under the doctrine of plain error." *People v. Mudd*, 2022 IL 126830, ¶ 21. The State argues that Cleveland never sought the redaction of, or raised as error the inclusion of, the specific evidence he complains of on appeal. There is no dispute that Cleveland's videotaped statement to the police contained several references to an occasion on which Cleveland pierced C.'s nipples with syringes—the police asked about this incident, and Cleveland answered their questions freely. Cleveland never sought to have these questions and answers redacted from the video of his statement, however. The statements were not raised in Cleveland's initial motion *in limine* that sought redaction of statements about

uncharged prior bad acts, although the motion detailed several other statements that should be redacted. Thus, the State, which agreed to redact all of the statements mentioned in that initial motion *in limine*, did not redact the references to nipple-piercing.

¶ 37    Cleveland's seventh motion *in limine*, which he claims sought the redaction of the references to the incident, did not in fact do so. Rather, the motion sought the removal of certain statements by the officers who questioned Cleveland that reflected their reactions to his conduct, identifying seven statements in which the officers commented on Cleveland's actions or voiced opinions about what C. must have felt as those acts took place. However, none of those statements included any reference to nipple-piercing. The only mention of nipple-piercing in the motion was an objection to the *body language* of one officer during certain comments, and sought only the redaction of the following comments and language: " 'Crazy, out of control things, remember it's not the worst thing you have done, you went bat shit crazy' *all the while showing through his body language his disdain* for Defendant's allege [*sic*] piercing of his wife's nipples with a syringe." (Emphasis added.) It was the detective's reaction to the nipple-piercing, not any of the underlying references to that nipple-piercing, that the motion sought to eliminate.

¶ 38    Further, Cleveland's posttrial motion did not mention the references to nipple-piercing at all, arguing only that the trial court erred in denying his seventh motion *in limine* because the video contained irrelevant and prejudicial "opinion statements regarding the ultimate question of fact in this case; whether these sexual acts with Defendant's wife were consensual or excessive[,] out of control acts." Cleveland argued that the officers' "comments, questions and body language" impermissibly bolstered the State's case and inflamed the sympathy of the jurors. Cleveland never asked the trial court to redact the actual references in the video to nipple-piercing, or raised the inclusion of those references in his posttrial motion. Thus, he forfeited the argument that he now

seeks to raise on appeal: that the trial court erred by allowing the inclusion of those statements in the redacted video. *Id.*

¶ 39 Despite this forfeiture, the issue would be reviewable if it met the standards of plain error. *Id*. ¶ 22 (explaining that plain error may be found where the error is clear and either the evidence was closely balanced or the error affected the fundamental fairness of the trial). But Cleveland does not offer any argument that the issue meets these standards. He thus has forfeited any such plain-error argument. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56.

¶ 40 "It is well settled in Illinois that an appellant who fails to raise an issue before the trial court forfeits the issue and may not raise it for the first time on appeal. [Citation.] The purpose of the forfeiture rule 'is to encourage parties to raise issues in the trial court, thus ensuring both that the trial court is given an opportunity to correct any errors prior to appeal and that a party does not obtain a reversal through his or her own inaction.' " *Williams v. Bruscato*, 2019 IL App (2d) 170779, ¶ 24 (quoting *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co*., 2015 IL 118372, ¶ 14). We reject Cleveland's attempt to raise for the first time on appeal an evidentiary issue that he never brought before the trial court: the admissibility of the references to nipple-piercing.

¶ 41                                             2. Eighth Motion *in Limine*

¶ 42 Cleveland's remaining evidentiary argument is that the trial court erred in denying his eighth motion *in limine*, in which he sought to have certain statements restored to the redacted video under the doctrine of completeness. He also argues that the restoration of the statements would not have violated the rape shield law, an argument that the State disputes.

¶ 43    The admission of evidence at trial is within the trial court's sound discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74.  We will not reverse the trial court's ruling unless it clearly abused that discretion.  *Id.*; *People v. Craigen*, 2013 IL App (2d) 111300, ¶ 41.  A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 44    As noted above, the rape shield law bars evidence of the victim's prior sexual activity unless it directly relates to whether the victim consented to the specific sexual conduct charged or "when constitutionally required to be admitted."  725 ILCS 5/115-7(a) (West 2014).  The burden of proving the necessity for the admission of the evidence is on the proponent.  See *id.* § 115-7(b) (the trial court "shall not admit evidence under this Section unless it determines at the hearing that the evidence is relevant and the probative value of the evidence outweighs the danger of unfair prejudice").

¶ 45    Cleveland argues that the trial court should have ordered two statements to be restored to the video under the completeness doctrine: (1) after his statement that "at times we had little whips," the State should have restored the rest of his statement that continued, "put pads on each turn it up to 10-15" and (2) after his statement that C. "agreed to it, play around with electrical stuff," the video should have included his statement that "every six months or year other stuff would occur with electrical stuff."  He contends that these two statements were directly relevant to the question of whether C. consented to the charged incidents involving placing electrodes on or in her.  However, Cleveland offers no argument that the admission of these statements was required under the completeness doctrine.  Indeed, he does not even explain what that doctrine is, much less how it applies here.  This omission is fatal to his argument.

¶ 46    Under the completeness doctrine, the remainder of a statement is admissible if its admission is necessary to prevent the jury from being misled, to place in proper context the portion of the statement already admitted so as to convey its true meaning to the jury, or to shed light on the meaning of evidence already presented. *Craigen*, 2013 IL App (2d) 111300, ¶ 45. However, the evidence already presented must actually be misleading. *People v. Caffey*, 205 Ill. 2d 52, 90-93 (2001). "A defendant has no right to introduce portions of a statement which are not necessary to enable the jury to properly evaluate the portions introduced by the State." *Id.* at 91 (quoting *People v. Olinger*, 112 Ill. 2d 324, 338 (1986)).

¶ 47    Here, the statements that Cleveland contends were in need of explanation or context through the admission of additional statements were (1) that "at times we had little whips" and (2) that C. "agreed to it, play around with electrical stuff." Nothing about these statements was misleading, however—they did not require explanation or context to be readily understood by the jury. Nor did these statements create a false impression. To the contrary, they were consistent with the other evidence in the case and indeed with Cleveland's defense of consent. The purpose of the completeness doctrine is not to assist a defendant in having all helpful evidence admitted, but only "to correct the misleading nature of a *** recorded statement or a portion thereof that has been taken out of context or is difficult to understand on its own." See *Craigen*, 2013 IL App (2d) 111300, ¶ 48. Where a statement is not misleading and does not cause prejudice, the defendant is not entitled to the admission of other evidence under the completeness doctrine. *Caffey*, 205 Ill. 2d at 91.

¶ 48    Even if these statements were somehow subject to the completeness doctrine, the omission of the statements was harmless because they were merely cumulative of other evidence. Cleveland contends that the omitted statements that he and C. "put pads on each turn it up to 10-15" and that

"every six months or year other stuff would occur with electrical stuff" were necessary to his defense that C. consented to his conduct of placing electrodes on and in her during the charged incidents. However, as he concedes, the redacted video of his statement to the police contained many other references to C.'s purported prior voluntary participation in conduct involving electrical contact, such as his statements that: she "agreed to it, play around with electrical stuff," she had signed an agreement that "it will be electrical, play toys, whatever you want, whether it's once or twice a week," there was a video showing prior consensual "electrical stuff," she could put the electrical clips on his nipples, and they had started with more "playful sexual things" involving "tying up, electrodes and some other stuff" but he then started taking it farther than he should.

¶ 49    The exclusion of evidence is harmless if it is merely cumulative of other evidence presented by the parties. *Id.* at 92. Where, as here, the record contained multiple other statements by Cleveland asserting that C. consented to the use of "electrical stuff" during sex, the exclusion of the statements raised here was at most harmless error.

¶ 50            B. Denial of Jury Instructions on Lesser Included Offenses

¶ 51    Cleveland's remaining arguments, which relate only to the aggravated battery and aggravated domestic battery convictions, have more force. He argues that a reasonable jury could have convicted him of simple battery and domestic battery on the basis that C.'s injuries amounted only to bodily harm, not great bodily harm, and thus the trial court erred in refusing to instruct the jury on those lesser included offenses. The record supports his argument as to some counts but not all. First, however, we must decide whether he forfeited this argument.

¶ 52    The State argues that we should not entertain Cleveland's arguments regarding the jury instructions at all, because he failed to raise them in the trial court. The State is correct that

Cleveland raised essentially no argument with respect to his tendered instructions on lesser included offenses during the jury instruction conference or in the posttrial motion. During the jury instruction conference, Cleveland briefly mentioned an earlier "argument that I made as far as great bodily harm or bodily harm" but did not repeat that argument or explain why it would support instructing the jury on the lesser included offenses of battery or domestic battery. In the posttrial motion, Cleveland offered even less support for his position, simply asserting without elaboration that the trial court erred in refusing to give the instructions that were denied.

¶ 53    Nevertheless, Cleveland tendered instructions on these lesser included offenses and assigned the refusal to give them as error in his posttrial motion. That was sufficient to preserve the error for appeal. Moreover, Cleveland did explain his position to the trial court at other times. For instance, during his motion for a directed verdict, which took place shortly before the jury instruction conference, Cleveland noted that C.'s injuries from being beaten with the belt consisted only of bruises and marks, and she did not seek medical attention. He argued that the State had at most shown bodily harm, not great bodily harm, and thus a requisite element of aggravated domestic battery had not been proven. Cleveland raised the same argument in his posttrial motion. Thus, the contention that the evidence of injury amounted only to bodily harm, not great bodily harm, was before the trial court both during the jury instruction conference and afterward. We reject the State's forfeiture argument here and turn to the merits of Cleveland's argument.

¶ 54    Determining whether a lesser included offense is applicable in a case involves two inquiries. *People v. Echols*, 382 Ill. App. 3d 309, 313 (2008). The first is whether the particular offense is indeed a lesser included offense of the charged offense. *Id.* The second inquiry is whether the evidence presented at trial would rationally support a conviction on the lesser included offense. *Id.* at 314. Although the giving of jury instructions is a matter within the trial court's

discretion, a court should give an instruction on a lesser included offense if there is "some" or "slight" evidence in the record that "would permit a jury rationally to find the defendant guilty of the lesser included offense and acquit him or her of the greater offense." *People v. Williams*, 293 Ill. App. 3d 276, 281 (1997).

¶ 55    The State does not contest that, in this case, battery and domestic battery are lesser included offenses of the charged offenses. The sole question involves the second inquiry: whether the evidence could rationally support a finding that C. suffered bodily harm rather than the great bodily harm required for aggravated battery and aggravated domestic battery during the incidents that formed the basis for counts 4, 5, and 6.

¶ 56                    1. Count 4: Aggravated Battery Involving Torture

¶ 57    We first consider count 4, which charged Cleveland with aggravated battery. Section 12-3.05 defines aggravated battery as a battery in which the defendant knowingly "[c]auses great bodily harm or permanent disability or disfigurement." 725 ILCS 5/12-3.05(a)(1) (West 2014). The Code does not define either "bodily harm" or "great bodily harm." Nor has our supreme court provided us with a clear definition of these terms, other than to say that bodily harm of any degree must involve "physical pain or damage to the body." *People v. Mays*, 91 Ill. 2d 251, 256 (1982).

¶ 58    The indictment charged Cleveland with "intentionally caus[ing] great bodily harm *** [involving] the infliction of torture to [C.], in that he placed electrical wires on [C.'s] legs and groin, and thereafter sent electrical current through the wires, cause burning and disfiguration [*sic*] to her legs and groin, with the intent to increase or prolong the pain, suffering or agony" of C.[1] The indictment thus alleged disfigurement and torture as well as great bodily harm.

_____

[1] The allegations regarding torture made the offense a class 1 felony. 720 ILCS

¶ 59 The evidence at trial supported the allegation of disfigurement: C. testified that Cleveland's application of electricity to her body and genitals resulted in permanent scarring from the burns, and that the top of her left foot still had very little feeling because Cleveland had tied it to the pillar too tightly during the incident. The jury was also instructed on the definition of torture—"the infliction of or subjection to extreme physical pain, motivated by an intent to increase or prolong the pain, suffering or agony of the victim"—and thereafter found that Cleveland had tortured C. in the course of this battery.

¶ 60 Viewing the trial evidence in its totality, we find that a jury could not have rationally found Cleveland guilty of intentionally inflicting "extreme physical pain" (torture) on C. and still have found him guilty only of a lesser degree of battery involving only ordinary "physical pain or damage to the body" (*i.e.*, ordinary bodily harm rather than great bodily harm). See *id.* Unlike the aggravated battery statute, the statute for battery contains no provision regarding torture. *Compare* 720 ILCS 5/12-3 *with* 5/12-3.05 (West 2014). The jury's finding that Cleveland tortured C. is inconsistent with the possibility of convicting him only of battery while acquitting him of aggravated battery.

¶ 61 Our conclusion is buttressed by the language of section 12-3.05(a)(1), which provides that an aggravated battery conviction can be based on great bodily harm *or* permanent disability or disfigurement. See *id.* § 12-3.05(a)(1). The evidence at trial showed that the incident resulted in permanent disfigurement to C., supporting a conviction of aggravated battery even apart from the jury's finding that Cleveland tortured C.

---

5/12-3.05(h) (West 2014).

¶ 62     For all of these reasons, we reject Cleveland's argument that the evidence at trial would have allowed a rational jury to find that he caused only ordinary bodily harm. The trial court did not err in refusing to instruct the jury on the lesser included offense of battery on count 4.

¶ 63                    2. Counts 5 and 6: Aggravated Domestic Battery

¶ 64     Our conclusion is different with respect to counts 5 and 6, which charged Cleveland with aggravated domestic battery. The charge of domestic battery can be shown by the infliction of bodily harm on a member of the family or household (*id*. § 12-3.2), while aggravated domestic battery requires proof of great bodily harm or permanent disability or disfigurement (*id*. § 12-3.3(a)). Thus, the primary difference between the two offenses is the degree of bodily harm inflicted.[2] As we did with count 4, we must determine whether the evidence could rationally support a finding that C. suffered bodily harm rather than the harm required for aggravated domestic battery during the incidents that formed the basis for counts 5 and 6. If so, then the trial court erred in refusing to instruct the jury on the lesser included offense of domestic battery and those convictions must be vacated.

¶ 65     Count 5 was based on Cleveland's beating of C.'s buttocks with a belt. The photographic evidence at trial showed that the beating cause deep bruising and red marks to C.'s body. However, as Cleveland pointed out in closing argument, C. did not seek medical attention or testify to needing any treatment other than the application of a cream for sore muscles. Although the photos suggested great bodily harm, there was also evidence from which a jury could rationally have

---

[2] Aggravated domestic battery also can be based on strangulation (see *id*. § 12-3.3(a-5)), but that was not alleged here.

found Cleveland guilty of causing only bodily harm. Thus, the instruction on the lesser included offense of domestic battery should have been given as to count 5.

¶ 66    Our analysis of count 6, which was based on the videotaped incident involving the placement of electrodes on C, is similar. Unlike the earlier, unrecorded incident of electric shock, which caused burns to C.'s body that she documented, the evidence of this later incident did not indicate that it caused any disfigurement. Nor did the State allege that this incident involved torture. Further, although the video showed C. grimacing, gasping, and crying out in pain, she did not photograph or otherwise document any injuries and there was no evidence that she required medical treatment after this incident. In addition, there was other evidence, such as C.'s return after a brief exit to take Imodium, and her initial placement of the electrodes herself, from which a jury could perhaps have found that C.'s experience of the pain was not so great that she refused to participate in the incident. Although C. testified that Cleveland either had a gun in his back pocket or held a gun as well as his phone during the entire incident, some of the video showed Cleveland in his boxer shorts or showed one of his hands, and thus a jury could have disbelieved this portion of her testimony.

¶ 67    We emphasize that, to us, the level of pain C. experienced in this incident, as demonstrated by her recorded cries, tremors, and sobs, was credible evidence of great bodily harm. But we may not substitute our own credibility assessment for that of the factfinder. See *People v. Jones*, 175 Ill. 2d 126, 132 (1997) (the court's role is to determine whether some evidence supports the giving of an instruction, not to weigh that evidence). "Very slight evidence upon a given theory of a case will justify the giving of an instruction." *Id.*

¶ 68    "Where there is some evidence to support an *** instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion even if the evidence is conflicting." *People v.*

*Hari*, 218 Ill. 2d 275, 296 (2006). This strict standard is required to safeguard a defendant's due process rights. *Id.* As difficult as it is given the appalling evidence in this case, we are obligated to follow the law. We therefore find, albeit reluctantly, that the evidence could permit a jury to rationally find Cleveland guilty only of causing bodily harm, not great bodily harm, in this incident. The instruction on the lesser included offense of domestic battery should have been given as to count 6 as well. See *Williams*, 293 Ill. App. 3d at 281 (a court should give an instruction on a lesser included offense if there is even "slight" evidence in the record that "would permit a jury rationally to find the defendant guilty of the lesser included offense and acquit him or her of the greater offense").

¶ 69    "When the evidence raises the basis for the instruction, a trial court's refusal" to give the instruction "results in a denial of *** due process and entitles a defendant to a new trial." *Hari*, 218 Ill. 2d at 297. We vacate Cleveland's convictions on counts 5 and 6, and remand for a new trial on those counts. *Id.*

¶ 70                                    C. Remaining Issues

¶ 71    Cleveland's last argument is that the trial court erred in declining to merge his convictions on counts 4 and 6, both of which alleged the placement of electrodes on or in C.'s body. The State asserts that the two counts were based on separate incidents—count 4 was based on the earlier, unrecorded incident involving electrodes, while count 6 was based on the recorded incident—and that the indictment, closing argument, and jury instructions made that clear. We need not resolve this issue, however, as we have vacated Cleveland's conviction on count 6. See *People v. White*, 2011 IL 109689, ¶ 153 (appellate court should not engage in analysis of issues that are unnecessary to its resolution of the appeal). If the State seeks to retry Cleveland on count 6, he may make whatever arguments are appropriate.

¶ 72    Finally, because we are remanding this cause for a new trial as to counts 5 and 6, we must consider for double jeopardy purposes whether the evidence was sufficient to sustain Cleveland's conviction on those counts beyond a reasonable doubt. *People v. Jiles,* 364 Ill. App. 3d 320, 330-31 (2006). The double jeopardy clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence that it failed to muster in the first proceeding. *Id.* at 331. However, it does not preclude retrial if the evidence introduced at trial was legally sufficient to convict but the conviction must be set aside because of errors in the trial process. *Id.* (citing *People v. Olivera,* 164 Ill. 2d 382, 393 (1995)). "Evidence is sufficient when a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could find that the essential elements of the offense were proven beyond a reasonable doubt." *Id.*, citing *People v. Collins,* 106 Ill. 2d 237, 261 (1985). Applying that standard here, there was ample evidence supporting Cleveland's convictions of aggravated domestic battery. Double jeopardy does not bar his retrial on those counts.

¶ 73                                         III. CONCLUSION

¶ 74    For the reasons stated, the judgment of the circuit court of Kendall County is affirmed, except as to the defendant's convictions of aggravated domestic battery (counts 5 and 6), which are vacated. The case is remanded for a new trial on counts 5 and 6, should the State wish to pursue one, and for any other proceedings necessitated by this decision.

¶ 75    Affirmed in part and vacated in part.