NOTICE
Decision filed 01/05/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 220612-U

NO. 5-22-0612

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 20-CF-142 |
| | ) | |
| DONALD HEMMINGS JR., | ) | Honorable |
| | ) | Mark W. Stedelin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1 *Held*: We affirm defendant's conviction for unlawful delivery of a controlled substance over his claims that the State committed numerous discovery violations, that his counsel was ineffective, and that the trial court considered improper evidence during sentencing.

¶ 2 Defendant, Donald Hemmings Jr., was charged by information with unlawful delivery of a controlled substance in Marion County. Following a jury trial, defendant was found guilty, and the trial court sentenced him to six years in prison. On direct appeal, defendant contends that he was denied his right to a fair trial due to discovery violations involving the State's failure to preserve and provide certain discovery materials, his attorney's failure to review all the evidence that the State disclosed, and the State's failure to disclose surveillance videos and the identity of the confidential source until eight days prior to trial. Defendant also argues that he was denied a

1

fair sentencing hearing where the trial court considered factors inherent in the offense as aggravating factors and punished defendant for exercising his right to remain silent during the preparation of his presentence investigation report. For the following reasons, we affirm defendant's conviction and sentence.

¶ 3                          I. BACKGROUND

¶ 4     This recitation of the facts includes only those necessary to resolve this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties.

¶ 5     On July 6, 2020, defendant was arrested for delivering fentanyl to a confidential source, later revealed to be Imani Kaufman. The interaction between defendant and Kaufman was captured on a video recorded by an investigating officer as well as surveillance cameras outside the business, Farm Fresh, where the two met. The following day, the State charged defendant with unlawful delivery of a controlled substance, in violation of section 401(d) of the Illinois Controlled Substances Act, a Class 2 felony. 720 ILCS 570/401(d) (West 2018). The trial court appointed the public defender, attorney Emily Fitch, to represent defendant on July 8, 2020. On July 9, 2020, the State filed an informal answer to discovery that stated that it was providing Fitch with "copies of reports."

¶ 6     Fitch filed a motion for discovery on July 10, 2020. The motion for discovery requested, in part, "relevant written or recorded statements of persons whom the State intends to call as witnesses" and "[a]ny written or recorded statements made by the Defendant." The motion also asked the trial court to enter an order "compelling the State to preserve any audio or video in its possession or control of either the State's Attorney's office or any of its agents related to the

2

Defendant and this cause and to provide the Defendant with a copy of any such videos or audio recordings."

¶ 7    On March 1, 2022, the trial court vacated Fitch's appointment of counsel for defendant and appointed Jordan Vandeveer as counsel for defendant. The matter was set for trial on May 10, 2022, with a final pretrial on April 28, 2022.

¶ 8    On April 8, 2022, the State filed a "specific" answer to defendant's discovery request. The State listed three witnesses, one of whom was identified as a confidential source. At that time, the State did not disclose Kaufman's name but noted that it would disclose Kaufman's name "when this case is going to jury trial." With regard to defendant's discovery request for "relevant written or recorded statements" of witnesses, the State's response indicated that "[t]here are no recorded statements in discovery from witnesses." Regarding defendant's request for "[a]ny written or recorded statements made by the Defendant," the State's answer was, "Statements made by Donald Hemmings at the Centralia Police Department on 7/6/2020."

¶ 9    On April 28, 2022, the parties confirmed that they were ready to proceed to trial as scheduled, and on May 3, 2022, the State filed a supplemental answer to discovery disclosing Kaufman's name and address. At that time, Kaufman was incarcerated at the Marion County jail. On May 6, 2022, defendant filed a motion *in limine* seeking to bar the State from using evidence disclosed after the April 28, 2022, final pretrial, including the videos provided by the State on May 3, 2022.

¶ 10    During a pretrial hearing on May 9, 2022, defendant objected to the State's use of the videos that purported to show the drug transaction. Defense counsel argued that the videos should have been disclosed sooner, as the failure to do so hampered her ability to investigate the circumstances surrounding defendant's arrest. Defense counsel noted that until she received and

reviewed the videos, she did not know that someone drove defendant to Farm Fresh. Defense counsel further noted that she did not know that the confidential source entered an "employees only" back room at Farm Fresh immediately before meeting defendant. Defense counsel also argued that the State's reason for the late disclosure, to protect the identity of the confidential source, was improper given that defendant would have known the identity of the confidential source from the time of his arrest.

¶ 11     The trial court noted that the proper sanction for any discovery violation would be to correct the error before banning the evidence. Defense counsel indicated that continuing the matter would be detrimental to defendant since he was in custody. Defense counsel inquired if the delay would be attributable to defendant. The court indicated that it would. Defense counsel responded, "that's not something Mr. Hemmings is willing to do at this time." Finding that defense counsel had not convinced it that the timing of the production of the video evidence prejudiced defendant, the court denied defendant's request to ban their use at trial.

¶ 12     At the same hearing, defense counsel mentioned a pending motion to suppress defendant's statement to the police following his arrest. In response to a question about the potency of the fentanyl, defendant told the police that "the stuff he has been messing with is so-so, and not as strong as some of the fentanyl in this town." The motion averred that there was no recording or written statement of the interview. The State noted that it was not going to use defendant's statement at trial and ultimately agreed to the granting of the motion. The motion was granted.

¶ 13     On May 10, 2022, the matter proceeded to a jury trial. The State called the manager of Farm Fresh to lay the foundation for the store's surveillance videos. One video showed the outside of Farm Fresh and included footage of the drug transaction. The other video showed that the confidential source, Imani Kaufman, entered the store before the transaction, and that upon

4

entering the store, she entered into an employees-only back room. They were admitted without objection.

¶ 14    Detective Dukes of the Centralia Police Department testified that earlier on the day of defendant's arrest, Kaufman was arrested after police found her in possession of a syringe containing narcotics. Kaufman agreed to work for the police in exchange for them forgoing charges related to the drugs she possessed at the time of her arrest. Kaufman believed that she could buy five "beans" from defendant. Detective Dukes testified that "bean" is a capsule containing fentanyl. Dukes explained that a confidential source is searched to make sure that they do not possess any money or drugs, and then police provide the confidential source with money, called "official advanced funds" (OAF), to purchase the drugs. The OAF is photocopied so that it can later be identified. Typically, the police keep constant surveillance on the confidential source during the transaction so they can confirm the confidential source meets with the suspect and does not meet with anyone else. Detective Dukes identified the money recovered from defendant following his arrest as being from the OAF provided to Kaufman. The State's exhibit was entered into evidence without objection. Also admitted without objection was a photocopy of the OAF made before it was provided to Kaufman.

¶ 15    Detective Dukes next testified that Farm Fresh had surveillance video from inside and outside the store, and that he acquired "all of that video footage." The Farm Fresh videos, and Dukes's own video of the alleged transaction, were admitted into evidence and played for the jury. Dukes testified that, contrary to his practice of keeping constant surveillance on a confidential source, Kaufman entered Farm Fresh and entered a back room inside of the store. Following the transaction, Kaufman returned to Dukes's car and gave him the three fentanyl beans she received

from defendant and $20 of the OAF. Duke identified the fentanyl "beans" that Kaufman turned over following the controlled buy. The drugs and the OAF were entered into evidence.

¶ 16    On cross-examination, Detective Dukes testified that he was not the officer who either arrested defendant or seized the OAF from defendant. A patrol officer with the department actually arrested defendant. Dukes admitted that he was unable to see Kaufman when she entered into the Farm Fresh and used the bathroom. Dukes was unaware of any cameras in the back room at Farm Fresh.

¶ 17    Imani Kaufman testified that she was granted use immunity, and she did not expect to be charged for her role in the offense. Kaufman testified that she was addicted to methamphetamine. Kaufman testified that on the morning of July 6, 2020, she was escorted off a certain property when the police searched her bags and found a syringe containing drugs. The police offered to forgo charging her if she cooperated with the police. Kaufman admitted that she was high on drugs at the time of her arrest.

¶ 18    Kaufman testified that she believed that defendant reached out to her through Facebook and told her that "he had just got back from the city and that he was good." She asked him if she could buy fentanyl, and they agreed to meet at the Farm Fresh so that she could purchase the drugs. The police searched her, provided her with the OAF to make the purchase, and drove her to Farm Fresh. Upon arriving at Farm Fresh, Kaufman did not see defendant outside, so she entered the store and asked to use the bathroom. The bathroom was located off an "employees only" back room. While in the bathroom, Kaufman communicated with defendant through Facebook, and she asked him to come inside the store. Defendant replied that he was not allowed inside the store, so Kaufman went outside to meet him.

6

¶ 19    Kaufman testified that she did not recall the exact number of beans that she bought, or how much she paid for them. Kaufman testified defendant told her that he did not have all the beans that he offered to sell her, as he "lost one or dropped one or something." She recalled defendant picking one bean up off the ground. Following the transaction, Kaufman met again with the police and gave them the drugs and the remaining OAF. Following Kaufman's testimony, the State called a forensic scientist from the Illinois State Police crime lab who testified that he tested one of the beans and found it to contain fentanyl. The State rested.

¶ 20    As a part of defendant's case in chief, he recalled the manager of Farm Fresh as a witness. She testified that the "employees only" back room had a video camera. This video footage from the date in question was not provided to the police as they did not ask for it; the police only requested video of the parking lot and the store.

¶ 21    The next morning, following rebuttal testimony from a State witness, the matter proceeded to closing arguments. Following closing arguments and deliberations, the jury found defendant guilty.

¶ 22    Defense counsel filed a motion for a new trial, alleging that discovery errors deprived defendant of a fair trial. Counsel specifically noted that prior to the April 28, 2022, pretrial hearing, the only discovery she received was Detective Dukes's report and a report from the Illinois State Police forensic laboratory. Defendant complained that the State failed to disclose Kaufman's identity or the videos of the offense based upon its argument that it needed to protect the identity of the confidential source. Among other things, defense counsel also argued that the State failed to disclose: (1) an arrest report from the arresting officer; (2) the interrogation video of defendant following his arrest; (3) the Facebook messages between Kaufman and defendant mentioned by Kaufman during her testimony and by the State during its opening statement and closing argument;

7

(4) the video from the back room at Farm Fresh; and, (5) dashcam or bodycam videos from Officer Ward taken at the time of defendant's arrest.

¶ 23    Prior to sentencing, a presentence investigative report was filed with the court. Attached to the report was a copy of the police reports on the matter. The attached report differed from the report provided to defense counsel in discovery in that, in addition to Dukes's report, it also contained a supplemental report authored by Officer James of the Centralia Police Department.

¶ 24    Following two hearings on the matter, the trial court denied defendant's motion for a new trial. Defendant was sentenced to six years in the Illinois Department of Corrections. This timely appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    Defendant raises several issues on appeal. Defendant first argues that there was a "complete breakdown" in the discovery process in the trial court. Defendant contends that the State's failure to disclose certain evidence, some of which came to light during the trial itself, were discovery violations that prejudiced defendant and denied him the right to a fair trial. Specifically, defendant argues that the following omissions were discovery violations: (1) the State's failure to preserve and disclose Facebook messages between defendant and Kaufman; (2) the State's failure to produce the supplemental police report of defendant's arrest; and (3) the State's failure to preserve and produce an interrogation video of defendant following his arrest. Defendant also claims that defense counsel was ineffective for failing to review video of the arrest of defendant. Defendant also argues that the trial court erred by finding that the State did not violate discovery rules by refusing to disclose Kaufman's identity until eight days prior to trial, or alternatively, trial counsel was ineffective for failing to seek earlier disclosure. Finally, defendant argues that he was denied a fair sentencing hearing where the trial court (1) punished him for exercising his right to remain

8

silent during the presentence investigation interview, and (2) considered factors inherent in the offense as aggravating factors. For the following reasons, we affirm. We address each contention of error in turn.

¶ 27                                  A. Discovery Violations

¶ 28    First, defendant contends that numerous discovery violations occurred. Defendant contends that the State's failure to disclose certain evidence, some of which came to light during the trial itself, constituted discovery violations that prejudiced defendant and denied him the right to a fair trial. Specifically, defendant argues that the following omissions were discovery violations: (1) the State's failure to preserve and disclose Facebook messages between defendant and Kaufman; (2) the State's failure to produce the supplemental police report of defendant's arrest; and (3) the State's failure to preserve and produce an interrogation video of defendant following his arrest. We consider each alleged violation in turn.

¶ 29    Before we can determine whether there was a discovery violation, we must determine whether the material was discoverable under Rule 412. *People v. Althoff*, 2020 IL App (2d) 180993, ¶ 23; Ill. S. Ct. R. 412 (eff. Mar. 1, 2001). There is no disputing that the video of defendant's interview at the police station, assuming it ever existed,[1] was discoverable under Rule 412(a)(ii) ("the State shall, upon written motion of defense counsel, disclose *** any written or recorded statements and the substance of any oral statements made by the accused ***, and a list of witnesses to the making and acknowledgement of such statements"). With regard to the supplemental police report, the State does not argue that it was not subject to discovery, but instead argues that "[i]f a discovery violation occurred as to the second report," defendant has not shown

_____

[1]As will be discussed below, the record does not affirmatively reflect that this video ever existed. The most that can be said is that the video would have existed if one assumes that the Centralia Police Department's in-house video system was operating properly on the day of defendant's arrest.

he was surprised or unduly prejudiced in his trial preparation. Since the State does not argue that the supplemental report was not discoverable, we will treat its nondisclosure as a violation of Rule 412.

¶ 30  Turning to the undisclosed Facebook messages, the State first argues that defendant forfeited this issue by failing to timely object to testimony about the messages at trial. Defendant contends defense counsel objected to Kaufman's testimony regarding the contents of the Facebook messages. We disagree. Defense counsel raised a hearsay objection to the State's question about what defendant said to Kaufman *outside* Farm Fresh. No objection of any kind was made to Kaufman's testimony regarding the Facebook communications.

¶ 31  "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review. *People v. Woods*, 214 Ill. 2d 455, 469 (2005) (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). If a defendant fails to satisfy either prong of this test, his challenge is considered forfeited or waived on appeal. *Id.* at 470 (citing *Enoch*, 122 Ill. 2d at 186). The purpose of this rule is to encourage parties to raise their concerns in the trial courts so that the lower courts have an opportunity to correct any alleged errors prior to appeal and that a party does not obtain a reversal through his or her own inaction. *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14; *People v. Cleveland*, 2022 IL App (2d) 191121, ¶ 40.

¶ 32  The first time any message was mentioned during trial was during the State's opening statement. The State told the jury that defendant messaged Kaufman that he was "back in town" and to let him know if she "needed anything." Defense counsel did not object. During Kaufman's direct examination, she testified that defendant contacted her following her arrest when she was in the holding cell. She believed defendant contacted her on Facebook. According to Kaufman,

10

defendant messaged her that "he had just got back from the city and that he was good." Kaufman asked defendant if she could purchase fentanyl "beans" from him. Again, no objection was raised regarding the existence of or the State's failure to disclose the contents of the Facebook messages.

¶ 33     Defendant's failure to timely object at trial deprived the court of the opportunity to correct any error regarding the nondisclosure of the Facebook messages and their contents. Accordingly, we find this issue forfeited. We note, however, that the forfeiture rule is an admonition to the parties and not a jurisdictional limitation on the reviewing court. See, *e.g.*, *People v. Porter*, 372 Ill. App. 3d 973, 977 (2007) (quoting *People v. Normand*, 215 Ill. 2d 539, 544 (2005)). Forfeiture notwithstanding, we will consider defendant's argument regarding the State's failure to disclose the Facebook messages as a discovery violation.

¶ 34     We next consider whether the Facebook messages were discoverable material and could thus lead to a discovery violation. *People v. Kladis*, 2011 IL 110920, ¶ 24. The State contends the Facebook messages were never in its possession or control and therefore were not subject to discovery. Defendant notes that Illinois Supreme Court Rule 412(f) provides that "[t]he State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession and control all material and information relevant to the accused and the offense charged." Ill. S. Ct. R. 412(f) (eff. Mar. 1, 2001). Defendant argues that Kaufman, as a confidential source, was an agent of the State, and that the State should have ensured the Facebook messages were preserved.

¶ 35     In support of his argument that the Facebook messages themselves were discoverable, defendant relies upon this court's decision in *People v. Johnson*, 2023 IL App (5th) 210416-U, wherein this court found that the State committed a discovery violation by failing to preserve surveillance video from a third party. *Id.* ¶ 18. In *Johnson*, the court noted that the State relied

11

upon the surveillance videos as supporting evidence of probable cause to obtain an arrest warrant for the defendant and concluded that the State had a duty to ensure that the video was placed within its possession or control. *Id.* In this matter, we note that the State relied upon the statements from the start of the trial and characterized Kaufman's testimony about the exchange as evidence that Kaufman and defendant agreed to the drug deal. In other words, the State argued that the statements were evidence of defendant's guilt.

¶ 36    We agree with defendant that the Facebook messages were discoverable and that the messages themselves should have been preserved and produced, or at the very least, a summary of the messages should have been disclosed to defendant prior to trial. Even if the prosecutor was unaware of the Facebook messages until shortly before trial, the State should have notified defendant as soon as the State became aware of the messages. The State has a continuing duty to promptly disclose discoverable material and information throughout the pendency of a case. Ill. S. Ct. R. 415(b) (eff. Oct. 23, 2020). The State's failure to preserve and produce the Facebook messages, or alternatively the content of those messages, was a violation of Rule 412.

¶ 37    Since defendant does not allege that the State withheld any exculpatory evidence, in order to determine whether defendant's due process rights were violated, we must determine whether the State acted in bad faith. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (when the State suppresses or fails to disclose material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), a due process violation occurs, and the good or bad faith of the State is irrelevant). Instead, defendant argues that the undisclosed material was potentially useful. When the State fails to preserve potentially useful evidence, a due process violation arises only if defendant can show the State acted in bad faith. *Fisher*, 540 U.S. at 547-48 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

12

¶ 38    Defendant contends that the discovery violations in this matter allowed the State to "ambush" him at trial, and that the violations demonstrate bad faith on the part of the State under the federal due process clause. In support of allegations of bad faith, defendant argues that: (1) the undisclosed materials were promptly requested after defendant was charged; (2) the State was not only aware of the Facebook messages, but it also intended, and ultimately did, use the messages at trial; (3) Officer James's supplemental report and the interrogation video following defendant's arrest were all available to the State and yet the State failed to request them from the police department; (4) the State made no attempt to preserve the messages or the interrogation video, and offered no explanation for its failure to disclose them or the supplemental police report; and, (5) there is no suggestion that the failure to preserve the Facebook messages was a part of normal police or prosecutorial practice. On appeal, defendant further argues that statements and alleged misrepresentations made to the court by the assistant state's attorney are evidence of bad faith. Finally, defendant asserts that the State knew or should have known that defendant was missing the supplemental police report based upon the fact that defense counsel believed that Detective Dukes personally arrested defendant and recovered the OAF from defendant. Defendant faults the State for failing to confirm, at that point during defense counsel's cross-examination of Dukes, that there were no discovery violations.

¶ 39    As noted above, when the State fails to preserve evidence that is potentially useful, as opposed to exculpatory, a due process violation arises only if defendant can show the State acted in bad faith. *Id.* (citing *Youngblood*, 488 U.S. at 58). Bad faith "implies a furtive design, dishonesty or ill will." *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995). In assessing the State's duty to preserve evidence, the court should consider "whether the State acted in good faith and per its normal practice and whether the evidence was significant in [the] defendant's defense and was

13

such that comparable evidence could not be obtained by other reasonable and available means." *People v. Nunn*, 2014 IL App (3d) 120614, ¶ 17. In determining whether due process was violated, a court should consider the degree of bad faith by the State and the importance of the lost evidence compared to the evidence at trial. *Id.* Mere negligence is insufficient to establish bad faith. *Youngblood*, 488 U.S. at 58.

¶ 40   First, we consider defendant's arguments related to the Facebook messages. Defendant argues that the State's failure to disclose either the messages between Kaufman and defendant or the substance of those statements was done in bad faith. In support of his argument, defendant notes that the State's formal discovery disclosure indicates that it previously disclosed written statements from defendant in the informal discovery previously tendered to the defense, but that the discovery did not disclose the Facebook messages. Defendant also notes that the State did not disclose the Facebook messages or the existence of the Facebook messages even after it disclosed Kaufman's identity. Notwithstanding the fact that the messages were never disclosed, the State referred to the alleged messages during its opening statement, elicited testimony from Kaufman regarding the messages, and referenced at least one of the messages during closing argument. Defendant contends this is all evidence of the State's bad faith. We disagree.

¶ 41   Defendant did not object or claim unfair surprise at trial. Posttrial, defendant simply argued a conclusion: that she could have attacked Kaufman's credibility about what was contained in the messages. Defendant fails to explain what might have been contained in the messages that would have significantly challenged Kaufman's testimony. The discovery provided to defendant and the evidence at trial established that Kaufman and defendant communicated with each other, and that defendant was willing to sell fentanyl. Defendant appeared at the Farm Fresh at a time presumably established by the parties for the purpose of selling fentanyl to Kaufman, and defendant in fact

14

sold fentanyl to Kaufman. Defendant did not argue or deny that he was the person depicted in the video, that he agreed to meet with Kaufman, or that he did not possess some of the OAF that was previously provided to Kaufman. Following the transaction, Kaufman was in possession of fentanyl and defendant was in possession of some of the OAF provided to Kaufman. We fail to see how the Facebook messages were significant to the defense, especially when compared to the evidence in the case. *Nunn*, 2014 IL App (3d) 120614, ¶ 17.

¶ 42    Additionally, we note defendant was a party to those messages, meaning that defendant had access to the messages himself, or at the very least knew of their content. In other words, the same evidence was obtainable by other reasonable and available means. *Id*. Succinctly stated, defendant fails to show how the Facebook messages, or the contents thereof, were significant to his defense. Under these facts, we cannot conclude that the State, or its agents, acted in bad faith in failing to preserve and produce the Facebook messages.

¶ 43    We next consider whether the failure to disclose the interrogation video constituted bad faith on the part of the State. We initially note that that defendant's argument assumes that the video existed in the first place. We do not find support for this conclusion in the record. During the first hearing on defendant's posttrial motion, Chief Steven Whritenour of the Centralia Police Department testified that the holding cells and the interview rooms at the police department have cameras that operate 24 hours a day, seven days a week. He also testified that "[e]very person who comes to the police department is going to be recorded. So [defendant] and anyone else for that matter would be on video."

¶ 44    Defense counsel and the trial court understood his testimony to mean that all areas of the police department are recorded around the clock, and that the recording equipment was functional at the time defendant was present following his July 6, 2020, arrest. Chief Whritenour's testimony,

15

however, also contained disclaimers. He testified that the recording equipment often had problems, and that he called the third-party service provider "30 to 40 times a year," meaning that he called them for problems with the system "three to four times a month." Each service call required a service ticket. Although Chief Whritenour did not have a service ticket showing that there was a problem on the relevant date, he offered to call the vendor and find out. The record does not indicate that this inquiry was ever made. On cross-examination, he testified that, although he was unaware of any problems with the system on July 6, 2020, there could have been problems.

¶ 45    Chief Whritenour also testified that the officers do not check the in-house camera system before an interview, so "there's no way an officer would know or would not know if the video was working." He also explained that it might take a day or even a week to resolve a problem with the system, and that there were sometimes power surges or internet issues that could cause the system to be down for several hours. Under these facts, we cannot assume that defendant's interrogation was ever recorded.

¶ 46    We note that Chief Whritenour also testified that interrogation videos are normally downloaded and saved, and that if there were a problem with the recording equipment, the officer would normally notify the State regarding this fact. The record does not reflect that this occurred in the matter. See *id.* (one factor in determining whether the State acted in bad faith is whether the State's actions comported with its usual practices). Notwithstanding this fact, we further note that even before Chief Whritenour testified, defense counsel told the court, "And I don't believe it was necessarily bad faith by any officer not to preserve that video." In the absence of proof that the video ever existed, defendant cannot prove that the lack of the video is proof of bad faith on the part of either the Centralia Police Department or the State.

16

¶ 47    For these reasons, defendant has not demonstrated that the video of defendant's interrogation would have been significant to the defense. *Id.* For the foregoing reasons, we find defendant failed to meet his burden of proving that the State acted in bad faith by failing to preserve and produce defendant's interrogation video.

¶ 48    We next consider defendant's claim that the State acted in bad faith by failing to disclose the supplemental police report authored by Lieutenant James of the Centralia Police Department. Defense counsel learned of the existence of this report when it was attached to the presentence investigative report. Even so, we cannot find that defendant proved that the State acted in bad faith for failing to disclose this report.

¶ 49    Initially, we note the State argued below that there was no evidence that it actually failed to disclose the supplemental report. We assume, for the sake of this appeal, that the supplemental report was never provided to defense counsel. The content of the report is helpful to the resolution of this matter:

> "At the above listed date and time we conducted a controlled buy of Fentanyl [*sic*]. I was told the suspect, Donald Hemmings was a passenger in a black car without front registration, headed north in the alley by the West Side Farm Fresh. I saw the black car and Donald at W Rexofrd [*sic*] and College. I immediately stopped the vehicle. Rachel Emmert was the driver. I had Donald exit the cra [*sic*] and he was placed in custody.

> A check of Rachel Emmert's information revealed she had a Suspended Drivers License [*sic*] so she was taken into custody as well. The car was towed.

> At 1444 hours I advise Rachel of her constitutional rights and warning. Rachel understood her rights and wished to make a statement. Rachel said she took Donald to Farm Fresh to purchase some food. Donald saw [Kaufman] and asked if she could give her a ride. Rachel said she does not get along with [Kaufman] so she elected not to. Donald talked to [Kaufman] for a little bit but Rachel said she was messing with her phone and don't [*sic*] know what they were doing. (It's important to note, Rachel or Donald [*sic*] never went inside Farm Fresh).

> I issued Rachel a citation for Driving on a Suspended Drivers License and she was issued a [*sic*] NTA for bond."

17

This version of the police report also listed six Centralia police officers, including Dukes, James, Ward, and Whritenour, as having been assigned to the case. Although the initial report provided to defense counsel simply listed a "driver" along with her contact information, the supplemental report contained more: the driver's statement to the police.

¶ 50    At a hearing on defendant's posttrial motion, defense counsel argued that the second report listed the driver and that defense counsel could have interviewed the driver "and been able to present her as a witness who could have testified that [Kaufman] threw money in the car, and [defendant] did not have anything on him."

¶ 51    The trial court stated, insofar as the supplemental report was concerned, that it considered the strength of the undisclosed evidence, the likelihood that prior disclosure would have helped defendant discredit evidence at trial, and "the willingness of the State and [the] specific [harm] caused by the failure to produce the police report." The trial court believed that the State's failure to disclose the supplemental report "was inadvertent. *** [I]n looking at the way the State prepared and presented its case, I don't believe the State saw the second report, to be honest with you."

¶ 52    Based on the record before us, it is apparent that the trial court did not believe that the failure to disclose the supplemental report was done in bad faith. Apparently, defense counsel agreed: at one point during the first hearing on defendant's posttrial motion, defense counsel told the court, "Now, I cannot argue that it is intentional that these discovery violations happened ***."

¶ 53    In light of defense counsel's statement, and the court's determination that the failure to disclose the supplemental report was inadvertent, defendant failed to prove bad faith on the part of the State. See *Danielly*, 274 Ill. App. 3d at 364 (bad faith implies a furtive design, dishonesty, or ill will). Further support for this conclusion is found in the fact that the State tendered a copy of Officer Ward's body camera footage showing defendant's arrest to defendant's first attorney.

18

Although this video is not a part of the record on appeal, in the trial court, the State argued that the supplemental report "doesn't offer anything new that the video doesn't show already." Having provided the defense with the video of defendant's arrest supports the conclusion that the State lacked bad faith in withholding the supplemental report.

¶ 54   Notwithstanding the fact that there were discovery violations, defendant failed to meet his burden of showing that the State acted with dishonesty or ill will regarding any one of the violations and consequently failed to establish bad faith by the State. See *Fisher*, 540 U.S. at 547-48 (a due process violation arises only if the defendant can show the State acted in bad faith). At most, the State and the Centralia Police Department were negligent. However, mere negligence is insufficient to establish bad faith. *Youngblood*, 488 U.S. at 58. In the absence of bad faith, no due process violation has occurred. *Id.*

¶ 55   Alternatively, in the absence of this court finding bad faith, defendant seeks reversal of his conviction and remand for a new trial based upon the violation of state discovery rules. Discovery violations can also be analyzed under Illinois Supreme Court Rule 415(g)(i). Ill. S. Ct. R. 415(g)(i) (eff. Oct. 23, 2020); see also *Kladis*, 403 Ill. App. 3d at 105. "Bad faith or the material exculpatory value of the evidence is not required for a discovery violation under Rule 415(g)(i)." *Althoff*, 2020 IL App (2d) 180993, ¶ 26. To establish a discovery violation under Rule 415, a defendant only needs to show that the State failed to comply with an applicable discovery rule or an order issued pursuant to it. *Id.* A discovery violation, by itself, is not enough to warrant a new trial. *People v. Robinson*, 157 Ill. 2d 68, 78 (1993).

¶ 56   Illinois Supreme Court Rule 412 requires the State to disclose, upon written motion of defense counsel, certain material and information within the State's possession and control. Ill. S. Ct. R. 412 (eff. Mar. 1, 2001). "A specific request for an item of evidence, pursuant to Rule 412,

puts the State on notice that the item must be preserved." *People v. Calloway*, 2019 IL App (1st) 160983, ¶ 67 (citing *People v. Newberry*, 166 Ill. 2d 310, 317-18 (1995)). Rule 412(f) requires that "[t]he State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." Ill. S. Ct. R. 412(f) (eff. Mar. 1, 2001). "The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation." *Robinson*, 157 Ill. 2d at 79. Compliance with the discovery requirements is mandatory. *Id.* at 78.

¶ 57     If the State fails to comply with its discovery obligations under Rule 412, Rule 415 allows the trial court to impose sanctions. "[T]he court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances." Ill. S. Ct. R. 415(g)(i) (eff. Oct. 23, 2020). Rule 415 sanctions may be imposed without any showing that the State acted in bad faith. *Calloway*, 2019 IL App (1st) 160983, ¶ 68.

¶ 58     As we previously found, discovery violations occurred in the trial court. However, the State's failure to comply with discovery requirements does not require a reversal absent a showing of surprise or undue prejudice. *Robinson*, 157 Ill. 2d at 78. The burden of showing surprise or prejudice is upon the defendant, and the failure to request a continuance is a relevant factor to consider in determining whether the new discovery actually surprised or unduly prejudiced the defendant. *Id.* Among the factors a reviewing court should reconsider in deciding whether a state discovery violation warrants a new trial "are the closeness of the evidence, the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose the new evidence." *Id.* at 81.

20

¶ 59 Looking at the last of the *Robinson* factors, we note that the trial court did not find that the State acted willfully in failing to disclose any of the discoverable materials. Our finding, above, that the defendant failed to prove bad faith on the State's part supports this conclusion. A review of the entire record shows that both the assistant state's attorney and defense counsel inherited this case within six months of the trial and long after the initial discovery had been tendered to defendant. Although we do not condone either side's failure to adequately review the status of the discovery, including what materials had been previously provided versus those matters that were not, it appears that the discovery violations that occurred in this matter were the result of miscommunication and negligence. In the absence of willful behavior on the part of the State, defendant does not meet the last of the *Robinson* factors.

¶ 60 Regarding the first of the *Robinson* factors, the closeness of the evidence, as noted above, the evidence at trial established the following: (1) Kaufman told the police that she could purchase fentanyl from defendant; (2) they agreed to meet at Farm Fresh; (3) Kaufman was searched and provided with OAF; (4) Kaufman and defendant met at Farm Fresh; (5) after meeting with defendant, Kaufman was in possession of fentanyl; and (6) defendant was immediately arrested and found in possession of some the OAF that was provided to Kaufman. The evidence against defendant cannot be characterized as "close." Accordingly, defendant does not meet the first of the *Robinson* factors.

¶ 61 Turning to the second and third *Robinson* factors, the strength of the undisclosed evidence, or the likelihood that it could have helped the defense discredit the evidence, the record before this court does not reflect that any of the undisclosed evidence would have been particularly useful to defendant. Although defendant argues that defense counsel would have been able to interview other witnesses, including police officers and defendant's driver, defendant's arguments about

21

what could have happened based upon these nonexistent interviews are based solely upon unsupported speculation. Again, we will not engage in speculation. Accordingly, and based upon the record before this court, we cannot find that the undisclosed materials would have either helped defendant discredit the evidence presented at trial or would have been particularly useful to defendant. *Id.*

¶ 62　While we acknowledge that the transcript indicates that defense counsel was surprised to learn, during Detective Dukes's cross-examination, that Dukes was not the arresting officer, we note that his police report indicates that he was not the arresting officer. In his report, Detective Dukes wrote, "Once Hemmings left the parking lot officers in the area stopped the vehicle Hemmings was in. Hemmings was then taken into custody." Later in the report, Detective Dukes's report states, "When Hemmings was arrested officers located money on Hemmings [*sic*] person. I was able to match the twenty and ten dollar bill [*sic*] that I had photocopied earlier." Although the contents of the supplemental report make it even more clear that Detective Dukes was not the arresting officer, we fail to see how defendant can fairly claim surprise based upon the State's failure to provide the supplemental police report prior to trial.

¶ 63　Although it is clear that discovery violations occurred, the record does not support the conclusion that the State acted willfully in failing to disclose the materials. Without engaging in speculation, we cannot say that any of the undisclosed materials were particularly strong or would have helped defendant discredit the evidence presented at trial. Finally, as previously noted, the evidence in this case was not close. Although we found state discovery violations under Rule 415, defendant has not shown sufficient surprise or undue prejudice requiring a reversal. *Id.* at 78.

¶ 64　Defendant next argues that the trial court erred by finding that the State did not violate discovery rules by refusing to disclose either Kaufman's identity or the videos of the offense until

eight days prior to trial. As noted above, defense counsel filed a motion *in limine* seeking to bar the State from using "[a]ll videos provided in Discovery on or after" the date of the final pretrial hearing. These videos consisted of the video taken by Detective Dukes of the controlled buy, the exterior video of Farm Fresh, and the interior video of the public area within Farm Fresh. The State did not disclose the videos sooner, because they revealed Kaufman's identity. During the hearing on defendant's motion, the State argued that it had a policy of withholding discovery identifying a confidential source until a defendant has confirmed that he is going to trial. The State noted that as soon as defendant confirmed that he was exercising his right to a trial, these videos were provided to defense counsel. Defense counsel stated that she "believe[d] that Mr. Hemmings would know on day one who it is that he was alleged to sell the drugs to." For this reason, defense counsel did not believe the State's argument that it was necessary to withhold the videos until defendant confirmed that he wanted a trial.

¶ 65    On appeal, defendant notes that Rule 412(j)(ii) provides that disclosure of an informant "shall not be denied" if the informant is going "to be produced at a hearing or at trial." Ill. S. Ct. 412(j)(ii) (eff. Mar. 1, 2001). There are several factors that a court may consider in determining whether fundamental fairness demands disclosure of a confidential source:

> "(1) whether the request for disclosure relates to the fundamental question of guilt or innocence rather than to the preliminary issue of probable cause; (2) whether the informant played an active role in the criminal act by participating in and/or witnessing the [event]; (3) whether the informant assisted in setting up its commission as opposed to being merely a tipster; and (4) whether it has been shown that the informant's life or safety would likely by jeopardized by disclosure of his identity." *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 35.

¶ 66    Although Kaufman's identity was ultimately disclosed, these factors are informative on the issue of the timing of the disclosure. Defendant correctly argues that these factors support early disclosure of Kaufman's identity under the facts of this case. We see no reason why the State

23

should have withheld Kaufman's identity or the videos showing the transaction until eight days prior to trial.

¶ 67    In support of his argument that he was prejudiced by the State's failure to disclose Kaufman in a timely fashion, defendant notes that by the time the Farm Fresh videos were disclosed to defense counsel, it was too late for her to seek the Farm Fresh video that showed the private back room inside Farm Fresh where Kaufman went upon entering the store. This is because that particular video was never requested by the police and consequently was never preserved.

¶ 68    It is not clear from the record whether the trial court found that the State did not violate discovery rules by refusing earlier disclosure of Kaufman's identity or the videos of the offense. The court did, however, deny defendant's *requested sanction*. The court noted that there was a motion *in limine* that asked for the evidence to be excluded at trial. The judge asked defense counsel how she believed defendant was prejudiced by the "late production." After mentioning that she was unaware that defendant did not drive himself to Farm Fresh, defense counsel stated that she was "unaware that the confidential source went into an employees only back room of Farm Fresh right before meeting Mr. Hemmings."

¶ 69    After clarifying that defense counsel claimed that she did not have adequate time to investigate the case, the judge asked, "In a discovery violation, isn't the proper sanction *** to correct the error before banning the evidence?" Defense counsel agreed, but stated that since defendant was in custody, "it would not—not be beneficial if I were to ask for a continuance." After asking the court whether defendant would have to "waive his 120 days," the court stated that the delay would be attributable to defendant. Defense counsel replied, "Exactly, Your Honor, and that is—that's not something that Mr. Hemmings is willing to do at this time."

24

¶ 70    The trial court later stated, "Now, my first reaction is if it was produced late then I'd have to look for other remedies before I would actually ban it. But I'm not convinced at this point in time that the late production is in anyway prejudicial to your client." In issuing his ruling, the judge noted that defense counsel had not moved to continue the case and said, "[Y]ou've not made an argument to me—sufficient for me to ban or sanction the State for late production of these videos by banning their production at trial. No, I'm not going to. So I am going to show that the motion *in limine* *** is denied."

¶ 71    While we cannot find that the trial court specifically ruled on the issue as to whether the State's late disclosure of Kaufman's identity was a discovery violation, it appears the court presumed a violation for the purpose of considering an appropriate sanction: in the absence of a violation, there would be no need for the court to consider any sanction. As noted by the State, despite defense counsel's claim of prejudice and the court's implication that it would have granted a defense motion to continue, defendant declined a continuance before it was actually offered by the court. "A defendant cannot request only the most drastic measures, such as either an immediate mistrial or the total exclusion of testimony by a witness, and then on appeal argue that he is entitled to a new trial when these requests are not granted." *Robinson*, 157 Ill. 2d at 78-79. When a defendant fails to request a continuance and elects to proceed to trial, the claimed error, if any, is waived. *Id.* at 79. In light of the fact that defense counsel declined to consider an intermediate sanction, the trial court did not abuse its discretion by denying defendant's motion *in limine* to exclude the evidence tendered to defendant after the final pretrial hearing.

¶ 72    For the foregoing reasons, we find defendant has failed to establish that the State's discovery violations caused defendant surprise or undue prejudice, individually or cumulatively. Accordingly, reversal of defendant's conviction is not warranted. *Id.* at 78.

¶ 73                    B. Ineffective Assistance of Counsel

¶ 74    Defendant contends that his counsel was ineffective for (1) failing to review arrest video

and (2) failing to move for the earlier disclosure of Kaufman's identity and the videos. On appeal,

defendant argues that defense counsel must "make reasonable investigations" in order to

effectively present a case (citing *Strickland v. Washington*, 466 U.S. 668, 691 (1984)) and that

"[a]ttorneys have an obligation to explore all readily available sources of evidence that might

benefit their clients." *People v. Morris*, 335 Ill. App. 3d 70, 79 (2002). Defendant argues that the

failure to make an earlier request for the disclosure of these materials fell below an objective

standard of reasonableness and that defendant was prejudiced by defense counsel's inaction. We

disagree.

¶ 75    Our review of ineffective assistance of counsel claims is guided by the standards set forth

in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People*

*v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel

under the *Strickland* standard, one must show both that (1) counsel's representation fell below

an objective standard of reasonableness (deficient performance prong) and （２） a

reasonable probability exists that, but for the error, the result would have been different

(prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy

both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel.

*People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient

performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411

(2000). " '[A] court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it

is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

we expect will often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527 (quoting *Strickland*, 466 U.S. at 697).

¶ 76    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. In other words, a defendant must establish that, but for counsel's unprofessional errors, a reasonable probability exists that the result to the case would have been different. *Strickland*, 466 U.S. at 694. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 77    Defendant argues that he was prejudiced in that defense counsel's failure to move for the earlier disclosure of Kaufman's identity meant that she (1) lost the opportunity to interview the Farm Fresh clerk who was present at the time and (2) lost the opportunity to timely preserve the video of the back room at Farm Fresh. As noted above, Kaufman entered Farm Fresh and then walked into an employees-only back room. With respect to the former, if trial counsel felt that she needed more time to investigate based upon the timing of the disclosure, she should have moved to continue the trial setting and put the burden on defendant to choose between his speedy trial rights and his right to effective assistance of counsel. See *People v. Bowman*, 138 Ill. 2d 131, 147 (1990) (noting "that the due process rights of defendants are not denied when they are forced to choose between the two constitutional rights of speedy trial and effective assistance of counsel"). Instead of seeking a continuance, defense counsel told the trial court that was something defendant was not willing to do. Defendant cannot now fairly complain about defense counsel being ineffective when he was not willing to waive his right to a speedy trial.

¶ 78     With regard to the lost opportunity to secure the video footage of the private back room, defendant fails to establish a reasonable probability that, but for the error, the result would have been different. The evidence established that Kaufman went into the back room and then the bathroom that was located off the back room. Kaufman testified that she did this to "stall" because she did not see defendant upon her arrival at Farm Fresh. Kaufman explained that this "was a life changing thing" and that she needed "to get [herself] together." Notwithstanding Kaufman's explanation as to why she entered the back room and the bathroom, defendant's argument that he was prejudiced by an inability to obtain the back room video is necessarily premised on the idea that something potentially useful or even exculpatory occurred in the back room. Because that video was never preserved, defendant's claim of prejudice is based on speculation of what Kaufman "could" have done in the back room.

¶ 79     Notwithstanding the absence of the back room video, defense counsel was still able to argue to the jury that Kaufman admitted to possessing a fentanyl and methamphetamine mix in a syringe hours before defendant's arrest that led to her cooperating with the police, that Kaufman was only "patted down" prior to the drug transaction, that she went into the back room at Farm Fresh without the officers' knowledge, and that the drugs consisted of "[t]hree small pills." Defense counsel argued that Kaufman had the fentanyl on her person prior to the drug transaction and used it to set defendant up for the charges.

¶ 80     Based upon the record and evidence before us, we cannot say defendant was prejudiced by his inability to review footage from the back room. Defense counsel cross-examined Kaufman and established that she entered the back room and then the bathroom, outside the view of both cameras and the police. Defense counsel argued that Kaufman herself possessed fentanyl hours before the transaction, that the police conducted a pat-down search of Kaufman prior to the transaction, and

that the fentanyl consisted of "[t]hree small pills." Having failed to meet the prejudice prong of the *Strickland* standard, defendant failed to prove that defense counsel was ineffective for failing to earlier move for the disclosure of Kaufman's identity and the videos.

¶ 81     Defendant next argues that he was denied effective assistance of counsel where defense counsel admitted that she was unaware that the State previously disclosed videos of his arrest, consisting of videos from a dashboard camera and a body camera worn by Officer Ward. It is undisputed that the State disclosed these videos, via email, to defendant's first attorney, Ms. Fitch. They were not used in defendant's trial and are not a part of the record on appeal.

¶ 82     During the hearings on defendant's posttrial motion, defense counsel acknowledged that the videos in question were sent to Fitch's email address. Based upon this fact, the trial court found that there was no discovery violation. Defense counsel argued that the State failed to file a certificate of service showing compliance with defendant's discovery request, and that the certificate would typically show that discovery on "evidence.com" was sent to defense counsel's email address. Defense counsel further argued that, had the State filed the certificate, she would have known to search Fitch's email. Defense counsel told the trial court that she had access to Fitch's email, and that she looked but did not see anything pertinent to the case. She told the court the email link did not contain defendant's name, that she still had "not had access to that email," and that "[t]here was no reasonable way for [her] to know even after a diligent search." She also told that court that she still had not seen the video.

¶ 83     On appeal, defendant notes that defense counsel "argued that the failure to view the arrest videos prevented her from sufficiently investigating all possible defenses." Because defense counsel was unaware of the videos (or the supplemental police report for that matter), she argued that she had "no way to be able to complete my arguments, to come up with all of my defenses,

29

to follow any leads, because I did not have the names" of the other officers involved in the investigation and the arrest of defendant. Defendant further argues that defense counsel compounded her error by failing to review the videos once she learned that they had been tendered in discovery, thereby depriving herself of the opportunity to make a proper prejudice argument in front of the trial court.

¶ 84    We first consider whether defendant established prejudice stemming from defense counsel's failure to find and watch the video of defendant's arrest. The State argues that defendant failed to demonstrated prejudice from defense counsel's failure to watch the arrest videos, arguing that "defendant has not established what evidence would be shown on those videos or how such evidence would have changed the outcome of his trial." The State also argues that defendant "has not established what issues counsel could have raised regarding his arrest had she viewed the arrest videos." Defendant responds that this is a circular argument: defense counsel could not raise arguments regarding prejudice based upon a video that she never watched. We note, however, that there was some evidence of the contents of the video that was available to defense counsel during the posttrial hearings: the supplemental police report that was filed as a part of the presentence investigative report.

¶ 85    During the posttrial hearings, defense counsel argued that her ability to investigate was hampered, in part, by the State's failure to disclose the supplemental police report, which, as noted above, explained the circumstances of defendant's arrest. In the trial court, the State argued that the supplemental report "doesn't offer anything new that the [arrest] video doesn't already show." Defense counsel had the supplemental report available to her at the time of the posttrial hearings. Presumably the arguments regarding any prejudice defendant may have suffered as a

30

result of defense counsel's failure to watch the arrest video would mirror arguments regarding the prejudice suffered from the State's failure to disclose the supplemental police report.

¶ 86    In arguing prejudice based upon the State's failure to produce the supplemental report, defense counsel claimed that she would have known that there were other police officer witnesses that she could have interviewed, but counsel offered no explanation as to what the officers could or would have said that demonstrated prejudice. For example, defense counsel argued that she would have known about the driver of the vehicle, but the name and contact information from the driver was provided in the initial police report that was disclosed to defendant. Defense counsel noted, again with regard to the supplemental police report, that had that report been disclosed, she would have known about the driver's statement. Defense counsel further argued that the fact that the driver was issued a ticket for driving on a suspended license was relevant, but without explaining how this information was relevant. Defense counsel also argued that she "would have been able to interview [the driver], and been able to present her as a witness who could have testified that [Kaufman] threw money in the car, and [defendant] didn't have anything on him." Defense counsel's arguments in front of the trial court regarding the State's failure to produce the supplemental police report were based upon speculation and unsupported by any evidence. Simply stated, the arguments made below do not support defendant's claim of prejudice.

¶ 87    Even now, on appeal, defendant claims that the driver's statement was "potentially exculpatory," but fails to clearly explain *how* the driver's statement was potentially exculpatory. Defendant notes, at one point in his brief, that defense counsel "knew nothing about the driver's statement that [Kaufman] walked over to the car in order to ask for a ride." Contrary to this assertion, the supplemental report states that it was defendant who asked the driver whether she was willing to give Kaufman a ride. The driver told the police that she did not like Kaufman and

31

so she declined. There is nothing to suggest that Kaufman asked for a ride from either the driver or defendant, or that Kaufman even knew that defendant asked the driver for a ride on her behalf. Based upon the record before us, we fail to see how the driver's statement was "potentially exculpatory" or how defendant was prejudiced by counsel's failure to view the arrest video of defendant.

¶ 88     Based upon the facts before this court, defendant cannot establish prejudice from the State's failure to provide defendant with the supplemental police report describing his arrest. The arguments made with regard to this report appear to be parallel to any arguments that could be made with regard to the arrest video. Accordingly, defendant cannot establish prejudice resulting from defense counsel's failure to watch the arrest video, either before trial (when she was unaware of its existence) or after trial. Consequently, defendant failed to meet his burden of establishing that defense counsel was ineffective.

¶ 89                                   C. Sentencing Issues

¶ 90     Defendant next argues that he was denied a fair sentencing hearing. Defendant contends that the trial court punished him for exercising his right to remain silent during his presentence investigation interview and considered two factors inherent in the offense as aggravating factors. The State argues that defendant forfeited these issues by failing to object at the sentencing hearing and by failing to file a motion reconsider the sentence. We agree with the State.

¶ 91     "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *Woods*, 214 Ill. 2d at 469 (citing *Enoch*, 122 Ill. 2d at 186). If a defendant fails to satisfy either prong of this test, his challenge is considered forfeited or waived on appeal. *Id.* at 470 (citing *Enoch*, 122 Ill. 2d at 186). The purpose of this rule is to encourage parties to raise their concerns in the trial courts so that the

32

lower courts have an opportunity to correct any alleged errors prior to appeal and that a party does not obtain a reversal through his or her own inaction. *1010 Lake Shore Ass'n*, 2015 IL 118372, ¶ 14; *Cleveland*, 2022 IL App (2d) 191121, ¶ 40. By failing to object during the sentencing hearing and by failing to raise the issues in a motion to reconsider sentence, defendant forfeited any challenge to his sentence.

¶ 92    We further note that defendant's sentencing issues are moot. Here, the trial court sentenced defendant to six years in prison with one year of mandatory supervisory release. Defendant's incarceration time was to be served at 50% and was reduced by 357 days for time served. Defendant's reply brief, filed on August 1, 2024, acknowledged that defendant was already on mandatory supervised release and that his sentence would be completely discharged on November 30, 2024. Our review shows that defendant completed his sentence and has been released from incarceration for this offense.[2]

¶ 93    "As a general rule, courts of review in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998). "An issue in an appeal is moot if 'the occurrence of events since the filing of the appeal makes it impossible for the reviewing court to render effectual relief.' " *People v. Dawson*, 2020 IL App (4th) 170872, ¶ 8 (quoting *People v. Jackson*, 199 Ill. 2d 286, 294 (2002)).

¶ 94    Although defendant asks this court to review defendant's sentence despite it being served, he does so without citation to any authority. Defendant fails to reference the mootness doctrine, or

---

[2]Illinois courts may take judicial notice at any time (see Ill. R. Evid. 201(f) (eff. Jan. 1, 2011)) and generally may take judicial notice of information on a government website. See *Kopnick v. JL Woode Management Co.*, 2017 IL App (1st) 152054, ¶ 26 (collecting cases). The Illinois Department of Corrections website, https://idoc.illinois.gov/offender/inmatesearch.html (last viewed Nov. 24, 2025) confirms defendant has already been released from incarceration.

any exception thereto, simply arguing that "the issue is still of importance if he is ever convicted again and the court looks to prior sentences in imposing" a prison term. We recognize that "[t]here are exceptions to the mootness doctrine, including the collateral consequences doctrine." *Id.* ¶ 9 (citing *In re Alfred H.H.*, 233 Ill. 2d 345, 361 (2009)). The collateral consequences exception " 'allows for appellate review, even though a court order or incarceration has ceased, because a plaintiff has suffered, or [is] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.' (Internal quotation marks omitted.)" *Id.* (quoting *In re Alfred H.H.*, 233 Ill. 2d at 361). " '[S]ubsistence of the suit requires *** that the continuing collateral consequences *** be either proved or presumed.' " *Id.* (quoting *In re Alfred H.H.*, 233 Ill. 2d at 361).

¶ 95    In *Dawson*, the defendant appealed her sentence after being resentenced following a probation revocation. *Id.* ¶ 1. In discussing the collateral consequences of a sentence that had already been served, the *Dawson* court considered the United States Supreme Court's decision in *Spencer v. Kemna*, 523 U.S. 1 (1998). *Dawson*, 2020 IL App (4th) 170872, ¶¶ 14-17. In *Spencer*, an inmate filed a *habeas corpus* action challenging the revocation of his parole. In rejecting the petitioner's challenge, the *Spencer* court stated the following:

> "An incarcerated convict's (or a parolee's) challenge to the validity of his conviction always satisfies the case-or-controversy requirement, because the incarceration (or the restriction imposed by the terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction. Once the convict's sentence has expired, however, some *concrete and continuing injury* other than the now-ended incarceration or parole—some 'collateral consequence' of the conviction—must exist if the suit is to be maintained." (Emphasis added.) *Spencer*, 523 U.S. at 7.

The defendant in *Spencer* argued a hypothetical possibility: that a future court could consider his parole violation as evidence of his lack of rehabilitative potential and might give him a more severe sentence as a possibility. *Id.* at 15. The *Spencer* Court rejected this hypothetical possibility as a

34

concrete injury, noting that it had previously rejected a similar claim because it was that this would be "contingent upon respondents' violating the law, getting caught, and being convicted" (*id.*), before quoting *Lane v. Williams*, 455 U.S. 624, 633 n.13 (1982): " 'Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring.' " *Id.*

¶ 96     Defendant's claim of future harm is based upon a future, hypothetical arrest and conviction. It is not a concrete and continuing injury and therefore is not part of a clearly applicable exception to the mootness doctrine. Defendant's contentions of error in his sentencing hearing are moot. Because the issues are both forfeited and moot, we will not consider this issue.

¶ 97                   III. CONCLUSION

¶ 98     For the foregoing reasons, defendant's Marion County conviction and sentence for unlawful delivery of a controlled substance is affirmed.

¶ 99     Affirmed.